Anita M. FLANDERS, Trustee of the Henry B. Ottolini Revocable Inter Vivos Trust, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. C-71-2032 SW.

United States District Court, N. D. California.

Aug. 4, 1972.

J. R. MacMahon, Freitas, Allen, McCarthy, Bettini & MacMahon, San Rafael, Cal., for plaintiff.

Edward O. C. Ord., Asst. U. S. Atty., James L. Browning, Jr., U. S. Atty., San Francisco, Cal., for defendant.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

This action was brought for the recovery of $66,357.48 in estate taxes and interest. Jurisdiction is conferred on the court by 28 U.S.C. § 1346(a) (1).

Henry B. Ottolini, a resident of Marin County, died on June 30, 1968. His assets, including an undivided one-half interest in a 650-acre cattle ranch, were held in a revocable trust. Plaintiff is trustee of the trust and individually owns the other undivided one-half interest in the ranch.

After the death of the decedent, but before the alternative valuation date, plaintiff, as trustee and in her individual capacity, entered into a Land Conservation Agreement pursuant to the California Land Conservation Act of 1965 ["Williamson Act," Cal.Govt.Code § 51200 et seq.]

These sections were enacted under specific authority of the Constitution of the State of California.[1] The consideration received by the land owner for what is essentially his temporary dedication of an interest in his property to a public purpose, is a reduction in his assessed value with the resultant reduction in his property taxes.[2] The form Land Conservation Agreement in the instant case, which restricts the property to agricultural use for a period of 10 years, specifically provides:

> 5. Owner shall not receive any payment from County in consideration of the obligation imposed hereunder, it being recognized and agreed that the consideration for the exemption of the within agreement is the substantial public benefit to be derived therefrom *and the advantage which will accrue to owner as a result of any reduction in the assessed value of said property due to the imposition of the limitations on its use contained herein.* [Emphasis added.]

At the time of the decedent's death, the fair market value of his undivided interest in the ranch was $220,000. After the Conservation Agreement was entered into by plaintiff, the fair market value thereof was reduced by 88% to $60,000, thereby reducing the decedent's interest to $30,000.

The estate elected the alternate valuation date of June 30, 1969, for estate tax purposes and filed the return on September 30, 1969, showing the value of the land as $25,000. This represented one-half of the value of the ranch after the land use restriction was placed upon it and after 2% of the value was deduct-

---

1. 1. *Declaration; maintenance, preservation and conservation of open space lands; purposes*

   *Section 1.* The people hereby declare that it is in the best interest of the state to maintain, preserve, conserve and otherwise continue in existence open space lands for the production of food and fiber and to assure the use and enjoyment of natural resources and scenic beauty for the economic and social well-being of the state and its citizens. The people further declare that assessment practices must be so designed as to permit the continued availability of open space lands for these purposes, and it is the intent of this article to so provide. (Added Nov. 8, 1966).

2. 2. *Assessment of open space lands*

   *Section 2.* Notwithstanding any other provision of this constitution, the Legislature may by law define open space lands and provide that when such lands are subject to enforceable restriction, as specified by the Legislature, to the use thereof solely for recreation, for the enjoyment of scenic beauty, for the use of natural resources, or for production of food or fiber, such lands shall be valued for assessment purposes on such basis as the Legislature shall determine to be consistent with such restriction and use. All assessors shall assess such open space lands on the basis only of such restriction and use, and in the assessment thereof shall consider no factors other than those specified by the Legislature under the authorization of this section. (Added Nov. 8, 1966.)

ed for lack of marketability because the decedent owned an undivided interest.

The Commissioner of Internal Revenue Service determined there was a deficiency of $60,671.73 plus interest in the amount of $5,685.75. Plaintiff paid these amounts on April 23, 1971, and brought this action for refund.

Defendant filed a motion for partial summary judgment contending that as a matter of law the land use restriction is ignored for federal estate valuation purposes. The parties have agreed as to the fair market value of the undivided interest if the land use restriction does not apply for estate tax purposes.

Defendant's motion was heard on May 19, 1972, and was granted in open court. At the request of defendant, the court has prepared this short memorandum.

There is no argument against including the decedent's interest in the ranch in his gross estate under 26 U.S.C. §§ 2033, 2038. The only issue is the value which should be used on the alternate valuation date.

■■ The criteria for valuing property included in the gross estate is either the fair market value at the moment of death (26 U.S.C. § 2031) or the fair market value on the alternate valuation date (26 U.S.C. § 2032). Fair market value is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts, Treas.Reg. § 20.2031-1; United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336 (1943).

Plaintiff relies on 26 U.S.C. § 2032(a) which provided at the time in question:

The value of the gross estate may be determined, if the executor so elects, by valuing all the property included in the gross estate as follows:

\* \* \* \* \* \*

(2) In the case of property not distributed, sold, exchanged, or otherwise disposed of, within 1 year after the decedent's death such property shall be valued as of the date 1 year after the decedent's death.

The defendant's position is that the self-imposed, value depressing, land use restriction is ignored for federal estate valuation purposes and that the property is valued as it existed at the date of death, with consideration given to the market conditions on the alternate valuation date.

Plaintiff contends the language of the section must be literally read and since the decedent's interest in the value of the ranch had diminished to $25,000 before the alternate valuation date, that figure must be used for estate tax valuation purposes.

No cases deciding this issue were called to the court's attention and the court was unable to locate any.

■ The purpose of the federal estate tax is to tax the privilege of transmitting property at death based on its value. The original alternate valuation date legislation was enacted August 30, 1935. Prior to that time the value of property at the date of death was used for federal estate valuation purposes. However, during the depression which began in 1929, property values fell so rapidly that in some cases the estate tax amounted to more than the value of the property when the tax became due. In order to provide relief in such situations Congress enacted 26 U.S.C. § 811(j). The Senate Finance Committee had originally proposed an amendment which would have allowed a *deduction* of the shrinkage of value occurring between the date of death and a date one year later. The House insisted on the one-year later alternate valuation date rather than the deduction method as suggested by the Senate:

In lieu of this [deduction] provision, the conference action inserts a provision giving the executor an election with respect to the time as of which the property included in the gross estate is to be valued. Under existing law the valuation is made as

of the date of death. If the executor exercises the election given him by the conference agreement, all the property included in the estate on the date of death is to be valued as of the date one year after the decedent's death, except that the value (at the time of distribution, sale, exchange, or other disposition) of property distributed, sold, exchanged, or otherwise disposed of, is taken in lieu of its value as of one year after death. H.R. Rep. No. 1885, 1939–1 Cum.Bull., Pt. 2, pp. 663–64.

The House manager stressed that the changes made by the committee were to afford relief in those instances where the value of the estate had decreased as a result of a decline in the market:

> This permits the executor to value the property of a decedent as of one year from the date of death, within certain exceptions in the case of distributions, sales, etc. This would eliminate many of the hardships which were experienced after 1929 when market values decreased very materially between the period from the date of death and the date of distribution to the beneficiaries. 79 Cong.Rec. 14632 (1935) (remarks of Mr. Hill).

■ This legislative history thus shows that Congress intended that the *character* of the property to be valued is as it existed on the date of death although it could be *valued* at market conditions existing at the elected valuation date. Voluntary post mortem changes in the property were not considered except if they resulted in a sale or other disposition between the date of death and the alternate valuation date. In these instances, the valuation date was set as of the date of such sale or other disposition.

Subsequent to the enactment of the alternate valuation date section, the Treasury Department issued an interpretative regulation (Art. 11 of Regulations 80 (1937 Ed.)) which stated in part:

The property to be valued as of one year after the date of decedent's death, or as of date of decedent's death, or as of some intermediate date, is the *property included in the gross estate on the date of the decedent's death. As property and its value are separate and distinct, the former denoting legal rights, the latter the monetary measure of such rights, and as subdivision (j)* [26 U.S.C. 811(j)] *treats the two separately, it will be necessary in every case first to determine what property constituted the gross estate at decedent's death.* [Emphasis added.]

Another portion of this regulation provided that income received between the date of death and the alternate valuation date was includible in the gross estate. That portion of the regulation was struck down in Maass v. Higgins, 312 U.S. 443, 61 S.Ct. 631, 85 L.Ed. 940 (1941). The Court noted at page 446, 61 S.Ct. at page 632 that the alternate valuation date provision was enacted "to mitigate the hardship consequent upon shrinkage in the value of estates during the year following death. Congress enacted it in the light of the fact that, due to such shrinkages, many estates were almost obliterated by the necessity of paying a tax on the value of the assets at the date of decedent's death."

Although the Government argued that a different method of valuation should be followed if one date were chosen rather than the other, the *Maass* Court held that:

> If Congress intended the result for which the Government contends, namely that a different method of valuation should apply at the end of the one year period than that applicable as of the date of death, it would have been a simple matter so to state. That Congress had no such intention seems clear from the report of the House Managers on the conference committee report on the bill which embodied the language in question. *Id.* at 448–449, 61 S.Ct. at 634.

After the *Maass* decision the regulation was amended to read in pertinent part:

In valuing the gross estate under the optional valuation method, *all of the property interests existing at the date of death which are a part of the gross estate * * * constitute the property to be valued as of one year after the date of the decedent's death,* or as of the date of the decedent's death, or as of some intermediate date. Such property is hereinafter referred to as "included property." "Included property" as of *the date of the decedent's death remains "included property" for the purpose of valuing the gross estate under the optional valuation method even though it is changed in form during the optional valuation period by being actually received or disposed of, in whole or in part, by the estate.* Cum.Bull. 1941–1, p. 425. [Emphasis added.]

■ There is little question that a Williamson Act restriction artificially reduces the fair market value of the property for the period of time it remains on the property. The State legislature recognized this when it provided for the payment of deferred taxes (called a cancellation fee) in the event the property owner exercises his authority to terminate the agreement prior to its full term.[3] We are not, however, faced with the problem of determining the value to be placed on such property if such temporary restrictions were imposed on the property by the decedent prior to his death. Here, the sole question is whether the value reducing result of the post mortem act of the surviving trustee is to be considered in determining the alternative date valuation of such property.

This court thinks not.

It seems clear that Congress intended that the character of the property be established for valuation purposes at the date of death. The option to select the alternative valuation date is merely to allow an estate to pay a lesser tax if unfavorable market conditions (as distinguished from voluntary acts changing the character of the property) result in a lessening of its fair market value.

Accordingly, it is the order of this court that defendant's motion for partial summary judgment be, and the same is hereby, granted.