ESTATE OF F.G. HOLL, DECEASED, BANK IV WICHITA, N.A., EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6039-89.          Filed November 28, 1990.

*William M. Cobb, Jeffrey D. Arbuckle,* and *Jack D. Flesher,* for the petitioner.

*C. Glenn McLoughlin,* for the respondent.

COHEN, *Judge:* Respondent determined a deficiency of $1,249,427.39 in petitioner's Federal estate tax. After concessions, the issue for decision is the in-place value of the oil and gas reserves produced and sold between decedent's date of death and the alternate valuation date under section

2032(a)(1). Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect as of the date of decedent's death.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. F.G. Holl (decedent) died on December 21, 1985. Bank IV Wichita, N.A. (petitioner), timely filed an estate tax return (Form 706) with the Internal Revenue Service in Austin, Texas. Petitioner's principal office was located in Wichita, Kansas, at the time the petition was filed.

Decedent was an independent oil and gas operator. On December 21, 1985, decedent possessed 342 leasehold interests and mineral interests in producing oil and gas properties. Over 80 percent of the leasehold interests were located in Kansas and accounted for approximately 96 percent of the total appraised value of the interests. The remainder of the interests in oil and gas producing properties were located in Wyoming and Ohio.

### Nature of the Oil and Gas Industry

An owner of oil and gas property typically leases property to a lessee who explores for oil and gas on the property. The lessee is entitled to remove any oil or gas discovered during the lease period. If oil or gas is discovered, the lease usually provides for renewal as long as the property continues to produce oil or gas. Interests in oil and gas leases are generally assignable by the lessee in undivided fractional interests.

Leasehold interests are either working interests or overriding royalty interests. Owners of working interests pay the costs and expenses incurred in the drilling, development, and production of oil and gas property. The landowner is entitled to a fractional share of the oil and gas removed from his land and is not responsible for any of the costs of exploration or removal.

Overriding royalty interests, which represent a right to a fraction or percentage of the lessee's share of the minerals,

are sometimes carved out of the lessee's share of the oil and gas removed. Owners of overriding royalty interests generally do not pay any of the costs and expenses. Mineral interests are also referred to as royalty interests. Owners of mineral interests, like owners of royalty interests, generally do not pay any of the costs and expenses associated with the oil and gas property. In the oil and gas business, it is common for parties to hold only a percentage of the entire working interest.

Crude oil and natural gas are located underground. The minerals coexist with water and sand granules in the pore spaces of the reservoir rock. In a high-permeability reservoir that has been in production for a period of time, each quantity, or barrel, of oil in the entire reservoir has the effect of pushing the next barrel of oil to the surface. Practically speaking, it is not possible to identify the particular barrel of oil in-place that will be the next barrel produced and brought to the surface. It is possible that the oil that is a distance from the well bore may be pushed to the surface before the quantity that is nearer the well, although oil closer to the well bore is more likely to be produced next.

There is often a delay between the time oil is produced and the time it is sold. The frequency of oil sales is related to the capacity of the well to produce, storage facilities on the leased property, and other factors. If oil is sold by means of a pipeline connection, sales may occur every other day. If oil is transported by truck, the sale occurs when the oil is drawn from the storage tank; the frequency of sales varies between 1 and 3 times a month.

### Valuation of Oil and Gas Property

Petitioner elected to value the gross estate as of the alternate valuation date under section 2032(a). Petitioner reported that the fair market values of the producing oil and gas interests as of the date of decedent's death and on the alternate valuation date were $8,958,676 and $3,091,977, respectively. The marked decline in the value of the interests was primarily attributable to a sharp decrease in the price of crude oil during that period. During the 6-month period following decedent's death, the price paid

for crude oil in Kansas, by a large Kansas purchaser, dropped from $28 per barrel to $13 per barrel. The price of gas during this period was also generally decreasing.

Petitioner determined the in-place value of the producing oil and gas interests as of the alternate valuation date by employing one of the accepted methods in the industry for valuing oil and gas properties. That methodology represents an estimate of the price at which the property would exchange hands between a willing buyer and a willing seller. There are three basic steps in this method of valuation, referred to as the discounted future net cash-flow method.

First, the projected net cash-flow from the property is determined. The amount of reserves, the oil and gas to be produced over the economic life of the property, is estimated. This amount is applied to the projected price of oil and gas over the economic life of the lease to produce a future cash-flow. Future operating expenses and projected ad valorem and severance taxes are deducted to generate the future net cash-flow.

Second, the projected future net cash-flow is discounted to its present worth on the date of valuation. The discount rate is generally 1 percent above the prime rate where the leased property is located. The average prime rate in Wichita, Kansas, between decedent's date of death and the alternate valuation date was 9 percent.

Third, the present worth of the projected net cash-flow is reduced by an appropriate risk reduction factor. The risk reduction factor is a confidence factor that measures the uncertainty inherent in projecting the future cash-flow from the property interests. This reduction factor reflects the profit or the rate of return that the investor expects to receive from the property. After being adjusted by the risk reduction factor, the fair market value of a producing oil and gas interest is usually between 65 percent and 80 percent of the present value of the future net cash-flow. The internal rate of return on a producing oil and gas interest is generally in the range of 20 percent to 30 percent but can be as high as 35 percent.

The risks that are associated with an oil and gas property are categorized as technical, economic, and political risks. Technical risks are risks involved in predicting future

production and recovery operations. Economic risks are risks involved in predicting future product prices, expenses of recovery operations, and interest rates. Political risks are risks involved in predicting future tax liabilities and the ability to operate in a foreign country or in environmentally sensitive areas. The risks are cumulative in that they are estimated over the life of the property. The risk factor, however, is not proportional to time. That is, the risks associated with projecting the income over the economic life of the property increase over time. Accordingly, the risk reduction factor is lower in the earlier part of the projection.

An alternative method of valuation, the cumulative net cash-flow method, is also standard in the industry. Under this approach, the appraiser prepares a net cash-flow based on the same factors used in the first step of the discounted future net cash-flow method. The undiscounted cash-flow is accumulated over a certain period of time. The time period is generally shorter than the life of the lease.

Petitioner received $980,698.47 in net income from sales of oil and gas between the date of decedent's death and the alternate valuation date. Petitioner reported on its estate tax return that the value of the oil and gas produced and sold between the date of decedent's death and the alternate valuation date was $686,488.93. Respondent determined that the value was $930,839.76.

OPINION

Petitioner bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. Property included in the gross estate is generally included at its fair market value on the date of a decedent's death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all relevant facts. *United States v. Cartwright,* 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is a question of fact and the trier of fact must weigh all relevant evidence and draw appropriate inferences. *Hamm v. Commissioner,* 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court;

*Estate of Andrews v. Commissioner,* 79 T.C. 938, 940 (1982).

An estate may elect to determine the fair market value of the gross estate as of an alternate valuation date. Section 2032(a) provides as follows:

SEC. 2032(a). GENERAL.—The value of the gross estate may be determined, if the executor so elects, by valuing all the property included in the gross estate as follows:

(1) In the case of property distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date of distribution, sale, exchange, or other disposition.

(2) In the case of property not distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date 6 months after the decedent's death.

The purpose of section 2032(a) is to permit a reduction in the amount of tax that would otherwise be payable if the gross estate has suffered a shrinkage in its aggregate value between the date of a decedent's death and the alternate valuation date. *Maass v. Higgins,* 312 U.S. 443, 446 (1941); sec. 20.2032-1(b)(1), Estate Tax Regs.

The assets to be valued on the alternate valuation date include all property interests that existed on the date of a decedent's death and are a part of the gross estate as determined under sections 2033 through 2044. Sec. 20.2032-1(d), Estate Tax Regs. Those assets are referred to as "included property." Sec. 20.2032-1(d), Estate Tax Regs., also provides that:

such property interests remain "included property" for the purpose of valuing the gross estate under the alternate valuation method even though they change in form during the alternate valuation period by being actually received, or disposed of, in whole or in part, by the estate.
* * *

The parties agree that the proceeds derived from oil and gas reserves produced and sold between the date of decedent's death and the alternate valuation date are "included property." They also agree that the value of the oil and gas produced during the interim period for Federal estate tax purposes is the in-place value of those reserves on the date of severance. The parties have applied different

methods, however, to determine the in-place value of those reserves.

The parties rely primarily upon the valuations prepared by their respective experts. Expert opinion is admissible if it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. Both experts were qualified to express opinions on the in-place value of the oil and gas reserves.

## Petitioner's Appraisal

Petitioner presented the report and testimony of F. Doyle Fair (Fair), a consulting petroleum engineer. The amount reported on petitioner's Federal estate tax return, $686,488.93, was the amount Fair originally determined to be the in-place value of the reserves. Fair arrived at this value by use of a "shortcut estimate." This estimate was used because of time restraints imposed by the estate tax return filing date. Fair simply reduced the net proceeds from the interim sale of the reserves by a 30-percent risk reduction factor.

In his report, however, Fair used a more complicated method to measure the in-place value of the interim production as of the date of severance. Fair's opinion was that this appraisal process provided the most accurate measure of the interests being valued. This methodology resulted in an in-place value of $683,306 in the interim production. Fair testified that this value was slightly inflated because he improperly included the value of equipment in making his appraisals.

Fair appraised each of the oil and gas properties at 16 different time frames. These time frames represented the 15 changes in the price of oil between the date of decedent's death and the alternate valuation date. The oil prices used were representative of the prices paid for crude oil in Kansas. The prices used to appraise the gas interests were the actual prices from sales of gas, on the date of decedent's death and the alternate valuation date, adjusted for each time frame based on the increase or decrease in the price of gas during that period.

Fair employed the discounted future net cash-flow method to appraise the most valuable leasehold interests as of each

time frame. He also used the cumulative net cash-flow method to appraise some of the leasehold interests. The risk reduction that was applied to the present worth of the discounted future net cash-flow in each of the appraisals was the risk inherent in projecting the cash-flow over the entire estimated useful life of the lease.

The appraised fair market value of each leasehold interest during each time frame was then divided by the estimated reserves remaining on that date. This amount, the estimated value per barrel, was multiplied by the number of barrels actually produced during that time frame to arrive at Fair's opinion of the in-place value of the oil and gas reserves produced and sold between decedent's date of death and the alternate valuation date.

## Respondent's Appraisal

Respondent presented the report and testimony of Von B. Pilcher (Pilcher), a petroleum engineer and an employee of respondent. He reviewed and confirmed the computations made by another petroleum engineer, Charles Young (Young), who was also an employee of respondent. The computations were made in accordance with the procedure set forth in Rev. Rul. 71-317, 1971-2 C.B. 328. Young applied a discount rate of 11 percent to the net proceeds derived from the sale of oil and gas reserves during the 6-month period between the date of decedent's death and the alternate valuation date. The rate was used to discount the total proceeds back to the date of decedent's death. This amount was not further adjusted by any risk reduction factor.

## Discussion

The narrow issue for decision in this case is the correct method for determining the in-place value of oil and gas reserves produced and sold between decedent's date of death and the alternate valuation date. This issue has been addressed but not resolved by the Court of Appeals for the Fifth Circuit in *Estate of Johnston v. United States,* 779 F.2d 1123 (5th Cir. 1986). In *Estate of Johnston,* the court held that "the appropriate value to be assigned to oil and

gas produced during the interim period, for inclusion in the gross estate, is the in-place value of that oil and gas on the date of its severance." 779 F.2d at 1129.

The Court of Appeals for the Fifth Circuit also stated that respondent's method of determining the in-place value of the reserves, set forth in Rev. Rul. 71-317, 1971-2 C.B. 328, was "inadequate, considering the complexities of evaluating oil and gas interests, and the language of 26 U.S.C. sec. 2032(a)(1)." 779 F.2d at 1128. The court remanded for evidence—to be provided by experts—on the in-place value of the oil and gas reserves disposed of prior to the alternate valuation date.

Petitioner requests that we follow the decision of the Court of Appeals for the Fifth Circuit in *Estate of Johnston* and conclude that petitioner's expert correctly determined the in-place value of the interim production. We decide this case by weighing the respective opinions of the experts, rather than by a direct consideration of Rev. Rul. 71-317. Revenue rulings are not substantive authority but are merely a statement of the Commissioner's position with respect to a specific factual situation. *Stark v. Commissioner*, 86 T.C. 243, 250-251 (1986).

Petitioner argues that Fair utilized the same standard appraisal methodology in connection with his determination of the in-place value of the oil and gas reserves sold during the 6 months following decedent's date of death that he used for the date of death and the alternate valuation date appraisals. Therefore, petitioner contends, the consistent application of the standard appraisal methodology by its expert, appropriately adjusted to reflect actual fluctuations in pricing during the alternate valuation period, is the proper method of valuation for purposes of section 2032(a)(1).

Respondent claims that the methodology employed by Fair, although cloaked in traditional techniques used in the appraisal of oil and gas properties, is not consistent with standard appraisal methodology and fails to account for the difference between the asset being valued in a typical oil and gas appraisal and the asset being valued under section 2032(a)(1).

The standard appraisal methodology represents an estimate of the price at which the oil and gas property would exchange hands between a willing buyer and a willing seller. The appraiser has, in effect, determined the in-place value of the oil and gas reserves as of the applicable date of valuation. This determination represents the cumulative value of the total reserves to be produced and sold, and the buyer's right to receive the income therefrom, over the entire economic life of the property.

Where the appraiser is only attempting to determine the in-place value of the oil and gas reserves sold on a daily basis during the 6-month period between the date of a decedent's death and the alternate valuation date, the risks to be considered in the valuation are not the same as when the reserves to be produced and sold over the life of the property are valued. We believe that Fair erred by failing to account for these differences.

Using the discounted future net cash-flow method, the present value of the projected income from the sale of oil and gas reserves over the life of the property is further reduced by a risk factor. As the testimony indicates, this factor is basically a certainty factor. That is, the risk factor is designed to offset the estimates of future prices and reserves remaining, as well as other technical, economic, and political factors that can alter the projections of income to be derived over the life of the property. The risks, and therefore the risk reduction factor, increase over the life of the property.

As stated above, when Fair appraised each of the leasehold interests at each time frame, he applied the standard methodologies. Accordingly, the risk reduction factor that Fair applied to his projected net cash-flow represented the risks associated with the particular interest appraised, over the economic life of the property. This value was used to arrive at a net unit price for each quantity of oil or gas produced during that time period. There is no evidence before us to suggest that it is standard in the oil and gas industry to use the appraisal methodologies, as Fair did, to arrive at an average net price per unit. This method of valuation assumes that each quantity of oil or gas that is produced during that time period has a value

equal to a quantity of oil or gas that will be produced at the end of the economic life of the property. This assumption is contrary to the weight of the evidence presented in this case.

Respondent's expert, Pilcher, testified that, in the typical appraisal of an oil and gas interest, the projected value of the reserves to be produced will decrease over the life of the property. The reason that Fair's methodology does not reflect this fact, and the problem with Fair's methodology, is that the same risk reduction factor is applied to each quantity whether it is produced on day 1 or the last day of production. The risks, however, are not the same on day 1 as on the last day. As explained in Pilcher's written report:

The economic risks are negligible in that any change in the price of oil or gas would not affect the taxpayer in that same 24 hour period. The same is true for political risks. Only in the most remote and extraordinary circumstances could a political change occur which would affect the income of oil or gas property within a 24 hour period.

As far as technical risks are concerned, once in a while a well of its own accord, will unexpectedly fall dramatically in production from one day to the next. But even in the outside chance that this does happen, it only affects one day's production projection. Subsequent projections would of course be based on the new and lower production rate.

All of these areas of risks are trivial, and diminutive as far as predicting income on a day to day basis.

The risk reduction factor that Fair applied to the most valuable leasehold interests during the first time frame was between 20 percent and 35 percent. During the last time frame, Fair applied a risk reduction factor between 20 percent and 40 percent to the same properties. Effectively, the same risk reduction factor that was applied to each unit that was actually produced during each time frame was also applied to each unit to be produced at the end of the economic life of the property.

Petitioner did not offer any evidence to contradict Pilcher's assertion that the value of a quantity of oil or gas produced in the future would be less than a quantity that is currently produced. Fair did state that the risks associated with the recovery of reserves from an oil and gas property increase with time.

Petitioner contends in its brief that on a given date each quantity of reserves in-place is equal to each other quantity

of reserves in-place on that date. Petitioner asserts that each quantity of oil or gas is not specifically identifiable as it exists in-place and that each quantity is important in the process of pushing the next quantity of oil or gas to the surface. Therefore, petitioner argues that the unit which is actually severed on a given date must be equal in value to the units that remain in-place on that date.

We cannot accept this reasoning. By applying a risk reduction factor that increases with time, petitioner has acknowledged that the projected value of the reserves to be severed at the end of the economic life of the property would decrease over time. In valuing reserves as of the date of severance, however, petitioner has applied the same risk reduction factor to each quantity of reserves, regardless of when the quantity is severed. Petitioner disregards the purpose and function of the risk reduction factor, which is to offset the uncertainties inherent in projecting future income and expenses over the life of the property. The risks and uncertainties in valuing a particular quantity of in-place reserves to be produced on a daily basis are negligible, and the risk reduction factor should be adjusted to reflect this fact. If the reduction is not adjusted, the reserves to be severed as of the date of valuation are undervalued. In this case, the price changes actually occurring presumably reflect factors that would have been covered by a risk reduction adjustment.

Petitioner also states that it is well established that Congress, in providing two dates of valuation, did not intend that a different method of valuation should be employed merely because the alternate valuation date is chosen rather than the date of decedent's death, citing *Maass v. Higgins,* 312 U.S. 443, 448 (1941). From this, petitioner argues that respondent's method of valuing the interim production is a departure from the industry standard typically employed for a date of death appraisal and is therefore improper.

In the standard appraisal, the price of reserves as well as operating expenses and certain taxes are estimated in calculating the projected future net cash-flow from the property. In his appraisal of the interim production, Pilcher used the net proceeds derived from the interim production

to estimate the in-place value. The net proceeds figure used was derived from net sales of oil and gas during the alternate valuation period, less the operating expenses and equipment purchased during this period. Therefore, respondent considered the same elements in determining the net cash-flow that are considered in the typical appraisal at the date of a decedent's death and alternate valuation date. Neither party presented evidence of ad valorem or severance taxes during this period.

Petitioner would require respondent to ignore the actual sales price of oil and gas on the date of sale. Petitioner, however, in accordance with standard appraisal techniques, has used these same figures in its calculations of the projected net cash-flow over the life of the property. Both parties were attempting to value a quantity of reserves in-place. Because of the nature of the assets being valued, these methods are imprecise and involve estimates, and estimates and approximations are generally less reliable than evidence of actual sales of the property to be valued. See *Tripp v. Commissioner,* 337 F.2d 432, 434-435 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. Even if the valuation were to be at the date of death, foreseeable subsequent sales would be considered. Therefore, we cannot say that respondent erred by using the actual sales price as of the date of sale in his valuation. If respondent had used *only* the sales price to determine the in-place value, we would be inclined to conclude, as petitioner contends, that respondent was valuing the reserves in a different form than the reserves existed in as of the date of decedent's death and the alternate valuation date. Respondent, however, used the net proceeds and considered the same factors that are considered in the appraisal at the date of a decedent's death and the alternate valuation date. The difference is that respondent limited the projection of net cash-flow to the alternate valuation period, rather than estimate the total cash-flow over the economic life of the property.

Finally, we do not believe that respondent erred in not reducing his calculations by a risk reduction factor. Respondent effectively valued the reserves on a daily basis by using the net proceeds. The evidence indicates that the risks are trivial during this period of time. Therefore, it was

not necessary to apply a risk reduction factor during this limited time frame.

We must weigh the expert opinion evidence in light of the demonstrated qualifications of the experts and all other credible evidence. *Estate of Christ v. Commissioner,* 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). We are not bound by the opinion of any expert witness; we may accept or reject expert testimony that is contrary to our judgment. *Estate of Hall v. Commissioner,* 92 T.C. 312, 338 (1989).

We have found no precedent or logical support for petitioner's expert's reduction for risk applied to the facts of this case. The risk reduction factor, even though appropriate when determining the fair market value of the total in-place reserves, is not necessary when determining the in-place value of a known quantity of reserves as of a particular date of severance. Respondent has considered the price as of each date of severance as well as the operating expenses associated with those reserves. In our best judgment and in light of the expert testimony and other evidence before us, we accept respondent's determination that the in-place value of the reserves produced and sold between decedent's date of death and the alternate valuation date was $930,839.76. We have considered and reject petitioner's other arguments. Due to concessions by the parties,

*Decision will be entered under Rule 155.*