ESTATE OF F.G. HOLL, DECEASED, BANK IV WICHITA, N.A., EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT*

Docket No. 6039–89.     Filed November 15, 1993.

*William M. Cobb, Jeffrey D. Arbuckle,* and *Jack D. Flesher,* for petitioner.

*C. Glenn McLoughlin,* for respondent.

---

*See *Estate of Holl v. Commissioner,* 95 T.C. 566 (1990), revd. 967 F.2d 1437 (10th Cir. 1992).

SUPPLEMENTAL FINDINGS OF FACT AND OPINION

COHEN, *Judge:* This case is before us pursuant to the remand of the Court of Appeals for the Tenth Circuit in *Estate of Holl v. Commissioner,* 967 F.2d 1437 (10th Cir. 1992), revg. 95 T.C. 566 (1990). The sole issue is the in-place value of certain oil and gas reserves as of the date of severance, for purposes of inclusion in the gross estate on the alternate valuation date under section 2032(a)(1). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

In our prior opinion, we rejected petitioner's appraiser's value, $683,306, and accepted respondent's determination that the value of the reserves was $930,839.76. Each party, in accordance with standard appraisal techniques, used actual prices in calculating the projected net cash-flow over the life of the property and then adjusted that calculation to arrive at a value for the reserves in place. *Estate of Holl v. Commissioner,* 95 T.C. at 578. Our decision was based on our rejection of petitioner's appraiser's application of a "risk reduction factor" to the present value of the projected future net cash-flow. Because we rejected petitioner's discount for risk and petitioner's criticism of respondent's methodology, applying the rule that petitioner bore the burden of proof, we accepted respondent's determination.

The Court of Appeals, however, concluded that we erred in accepting an erroneous method of valuation by the Commissioner's expert focusing on "the actual sales prices as of the date of sale in his valuation." *Estate of Holl v. Commissioner,* 967 F.2d at 1439 (quoting 95 T.C. at 578). The Court of Appeals remanded, directing us to:

consider evidence premised on a method of valuation starting with the pre-change value of the reserves reduced to possession and sold during the interim period from the date of death to the alternate valuation date. While the Estate's evidence generally following such an approach is persuasive, as a reviewing court we do not make a determination that this evidence of the Estate on this record must be accepted. On remand, the Tax Court should reconsider the valuation issue concerning the reserves produced and sold during the interim period "to determine the in-place value of the oil and gas produced as of the dates of severance" and evidence showing an "appropriate discount factor" to be applied. *Estate of*

*Johnston* [*v. United States*], 779 F.2d [1123] at 1128-29 and n.10 [(5th Cir. 1986)], in accord with 26 U.S.C. § 2032 and 26 C.F.R. § 20.2032-1. To accomplish this on remand, the Tax Court may choose to reconsider the present record, or it may have further proceedings allowing the parties to present additional evidence; the Court should then make its new findings and decision. [*Id.* at 1439-1440.]

Pursuant to the direction of the Court of Appeals, additional expert testimony was taken. Each party has argued in the alternative for two different values. Petitioner now contends that the value of the subject property as of the alternate valuation date was either $583,765 or $373,664. Respondent now contends that the correct value was either $931,664 or $869,605.53.

### ULTIMATE FINDINGS OF FACT

The prediscount fair market value of the reserves in place as of the date of decedent's death, but extracted and sold during the interim period from the date of death to the alternate valuation date, was approximately $935,000.

An appropriate discount factor to be applied for risk under these circumstances is .93. The fair market value to be included within the gross estate as of the alternate valuation date is thus $869,600.

### OPINION

Before discussing the expert testimony presented at the further trial in this case, we review the authorities cited by the Court of Appeals and in our prior opinion and set out the differences between the parties as to the results reached under those authorities.

Section 2032 allows an estate to elect to determine the fair market value of the gross estate for tax purposes as of the date 6 months after decedent's death. The purpose of that section is to permit a reduction in the amount of tax that would otherwise be payable if, as here, the value of assets in the estate has declined during the 6-month period. Under section 20.2032-1(d), Estate Tax Regs., assets remain a part of the gross estate for tax purposes even though they change in form during the alternate valuation period. Thus, as stated by the Court of Appeals, the valuation method must start "with the pre-change value of the reserves reduced to

possession and sold during the interim period from the date of death to the alternate valuation date." *Estate of Holl v. Commissioner,* 967 F.2d at 1439.

In *Maass v. Higgins,* 312 U.S. 443 (1941), the Supreme Court held that the value of an asset included in the gross estate as of the alternate valuation date must exclude gross income from the asset during the interim period. The Supreme Court invalidated a regulation that required rents, royalties, interest, or dividends received by an estate during the interim period to be included as part of the gross estate on the alternate valuation date. The Supreme Court reached its conclusion after considering an example given in the report of the House managers on the conference committee report on the bill enacting the predecessor of section 2032, noting: "In this example, appreciation and depreciation in the value of bonds, stocks, and other assets, during the year, are shown but dividends or interest received are not included." *Id.* at 449.

In this case, each party has valued the subject property by considering the actual net proceeds of approximately $980,000 received from sale of the extracted oil and gas during the interim period. Their first area of disagreement, however, is in the manner of allocating those proceeds to change in the value of property, on the one hand, or income from the property, on the other.

In *Estate of Johnston v. United States,* 779 F.2d 1123, 1129 (5th Cir. 1986), the Court of Appeals for the Fifth Circuit held that "the appropriate value to be assigned to oil and gas produced during the interim period, for inclusion in the gross estate, is the in-place value of that oil and gas on the date of its severance." In this case, both parties have determined the value as of the date of severance by accumulating the quantities and prices of the oil and gas sold as of each date of severance, deducting certain expenses, and applying certain discounts to the net proceeds.

The Court of Appeals for the Tenth Circuit, *Estate of Holl v. Commissioner,* 967 F.2d at 1439, also cited *Flanders v. United States,* 347 F. Supp. 95 (N.D. Cal. 1972). The District Court in *Flanders* pointed out that "the *character* of the property to be valued is as it existed on the date of death although it could be *valued* at market conditions existing at the elected valuation date." *Id.* at 98. The parties here dis-

agree in their descriptions of the character of the property to be valued. That difference, however, does not account for the differences between their ultimate opinions of value.

At the further trial in this case, petitioner presented the testimony and report of F. Doyle Fair (Fair), its expert in the first trial, and James L. Houghton (Houghton), a lawyer and certified public accountant and former tax partner for Ernst & Young.

Fair's second report resulted in a figure lower than that set forth in his report at the first trial because of two adjustments. First, Fair's second report was based on volumes of oil and gas that were actually sold, whereas the earlier report was based on anticipated sales volumes. Second, Fair adjusted the number of days considered in a particular time frame from 34 to 29. Neither Fair nor petitioner made any change in the claimed discount for risk that they relied on and we rejected in our prior opinion. The Court of Appeals for the Tenth Circuit did not expressly comment on that portion of our prior opinion, in which we stated:

> Where the appraiser is only attempting to determine the in-place value of the oil and gas reserves sold on a daily basis during the 6-month period between the date of a decedent's death and the alternate valuation date, the risks to be considered in the valuation are not the same as when the reserves to be produced and sold over the life of the property are valued. We believe that Fair erred by failing to account for these differences.

> \* \* \* \* \* \* \*

> By applying a risk reduction factor that increases with time, petitioner has acknowledged that the projected value of the reserves to be severed at the end of the economic life of the property would decrease over time. In valuing reserves as of the date of severance, however, petitioner has applied the same risk reduction factor to each quantity of reserves, regardless of when the quantity is severed. Petitioner disregards the purpose and function of the risk reduction factor, which is to offset the uncertainties inherent in projecting future income and expenses over the life of the property. The risks and uncertainties in valuing a particular quantity of in-place reserves to be produced on a daily basis are negligible, and the risk reduction factor should be adjusted to reflect this fact. If the reduction is not adjusted, the reserves to be severed as of the date of valuation are undervalued. In this case, the price changes actually occurring presumably reflect factors that would have been covered by a risk reduction adjustment.

> [*Estate of Holl v. Commissioner*, 95 T.C. 566, 575, 577 (1990), revd. 967 F.2d 1437 (10th Cir. 1992).]

In other words, Fair persists in applying a methodology that might be appropriate if a reserve being valued were to be extracted over an indefinite time in the future whereas, applying the methodology mandated in *Estate of Johnston v. United States, supra,* and approved by the Court of Appeals here, valuation is to occur as of each date of severance during a definite 6-month period. The use of the alternate valuation date effectively eliminates risk as to the property sold during the interim period by allowing actual market conditions to be considered.

Houghton similarly assumed discounts and rates of return that would, according to his testimony and report, represent common methodology in appraising mineral properties. They did not, however, take account of the minimal daily uncertainty over a 6-month known time frame. He asserted that the percentage discount for risk "usually ranges between 25% and 40% for proved producing reserves." His calculations assumed a rate of return of 25 percent.

Testing the reasonableness of petitioner's experts' assumptions, respondent's counsel inquired whether either of them would advise a seller to sell the interest to be valued for the amount set forth in the opinion of petitioner's experts. It was apparent from their responses that neither witness would advise a seller to sell at either value determined by petitioner's experts. Thus, argues respondent, neither reflects fair market value. Respondent also criticizes Houghton's report as treating oil and gas properties as equivalent to interest-bearing assets, such as the principal amount of a note that bears a particular rate of interest. The reasoning of the Supreme Court in *Maass v. Higgins,* 312 U.S. 443 (1941), requires distinction between capital changes and income on capital assets.

We agree with respondent's criticisms of petitioner's experts. Neither of their appraisals appears reasonable in allocating the cash proceeds to sale of capital, on the one hand, or return on capital, on the other. Only the latter is excludable from the gross estate as of the valuation date.

At the second trial, respondent presented the testimony of Forrest A. Garb (Garb), a qualified petroleum consultant, and Von B. Pilcher (Pilcher), the professional engineer who had testified for respondent at the first trial. Garb determined

that the in-place value of the interim production was $931,664. Garb's report explained:

This value considers the actual net revenue received for the produced oil and gas during the interim period. A reduction factor of 5% is assigned to account for any slight uncertainty as of the date of severance to a forecast of revenue for that date's severed production. The uncertainty on the "in-place" value as of the date of severance, for production about to be severed, would be small. This is especially true when the forecast of production is from more than 300 separate proved developed producing properties having established production performance trends, some of which have expected lives of over 20 years. The factor is for the slight uncertainty which might exist on the date of severance and is much less than the factor appropriate for a 20 year forecast. * * *

Conventional wisdom dictates that estimates of near term events are more accurate than estimates for events which will occur many years in the future. It is therefore obvious that a reserve produced in the near term has less uncertainty than a reserve produced many years in the future. This uncertainty is independent of the time value of money discount factor.

With reference to the time value of money adjustment used by the other experts, Garb stated:

The "in-place" value for the interim production presented in this study is a value which reasonably accounts for any minor uncertainty associated with oil and gas production and resulting revenues valued on the date of severance. The valuation, because it is on the date of severance, ignores the time value of money and any discounting which would be applied to revenues received in the future. To comply with the tax code, the production for each date of severance is valued as of that date, therefore no discount for delayed income is considered. This is slightly different than normal industry standards for estimating the FMV [fair market value] of a revenue stream.

Garb's analysis, however, did not allocate any value to the income earned during the 6-month period, as distinguished from the capital exchanged, and thus does not fully comply with the requirements of *Maass v. Higgins,* 312 U.S. 443 (1941), and the Court of Appeals here.

Pilcher was the only expert in the second trial who both (1) considered the time value of money and thus attributed a reasonable amount of the estate's receipts for the extracted minerals to income earned over the 6-month period and (2) used a reasonable adjustment for uncertainty. Pilcher used the future cash-flow projections from Fair's valuation of the properties as of the alternate valuation date and the 27-percent internal rate of return used in Fair's appraisal. He then

calculated an uncertainty factor based on the difference between the 27-percent internal rate of return and a 10-percent internal rate of return, the latter being 1 percent above the prime rate in effect during the valuation period. This appropriately allowed the greater return expected of high-risk ventures but also made an adjustment for the reduced risk during the 6-month interim period. Pilcher determined an in-place value of $869,605.53 by multiplying the 6-month net cash-flow of $980,698.47 both by the present value discount factor of .953463 and a risk or uncertainty discount factor of .93.

Pilcher thus was the only expert, in our view, who complied with the direction of the Court of Appeals to consider the "pre-change value of the reserves reduced to possession and sold during the interim period from the date of death to the alternate valuation date" and "an 'appropriate discount factor'" to be applied. *Estate of Holl v. Commissioner,* 967 F.2d 1437, 1439 (10th Cir. 1992) (quoting *Estate of Johnston v. United States,* 779 F.2d 1123, 1128-1129 and n.10 (5th Cir. 1986)) revg. 95 T.C. 566 (1990). Pilcher's revised estimate of value is thus, in our view, the most reliable evidence in the record, and our findings of fact are in accordance with that method.

To reflect the foregoing,

*Decision will be entered under Rule 155.*