T.C. Memo. 2005-131

UNITED STATES TAX COURT

ESTATE OF FRAZIER JELKE III, DECEASED, WACHOVIA BANK, N.A.,
f.k.a. FIRST UNION NATIONAL BANK, PERSONAL REPRESENTATIVE,
 Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3512-03.                    Filed May 31, 2005.

        D's gross estate included a 6.44-percent interest
in a closely held corporation (C) whose assets
consisted primarily of marketable securities.  C had
been in existence for many years, was well managed, and
had a relatively high rate of return in the form of
annual dividends coupled with capital appreciation of
approximately 23 percent annually for the 5-year period
before D's death.  Also during this 5-year period,
there was no intent to completely liquidate C, and its
securities turnover (sales) averaged approximately 6
percent annually.  At the time of D's death, the
securities had a market value of approximately $178
million and a built-in capital gain tax liability of
approximately $51 million if all of the securities were
to be sold on the valuation date.  The net asset value
of C without consideration of the effect of the built-
in capital gain tax liability was approximately $188
million.  The estate contends that the $188 million
value should be reduced by the entire $51 million

before considering discounts for lack of control and marketability.  R contends that the built-in capital gain tax liability should be discounted (indexed) to account for time value because it would be incurred in the future rather than immediately.  Under R's approach the reduction for built-in capital gain tax liability would be approximately $21 million.  The parties also disagree about the discounts for lack of control and marketability.

Held:  The built-in capital gain tax liability should be discounted to reflect when it is reasonably expected to be incurred.

Held further:  Amounts of discounts for lack of control and marketability decided.

Sherwin P. Simmons and Veronica Vilarchao, for petitioner.

W. Robert Abramitis, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Chief Judge:  Respondent determined a $2,564,772 deficiency in estate tax.  After concessions,[1] the issue for our consideration concerns the fair market value of decedent's interest in a closely held corporation, and in particular, the reduction, if any, for built-in long-term capital gain tax liability, and discounts for lack of marketability and control.

---

[1] The parties agree that the gross estate should be increased by decedent's right to receive a $116,784 income tax refund for 1999 and decreased by net administrative expenses of $23,680.

FINDINGS OF FACT[2]

Frazier Jelke III (decedent) died on March 4, 1999, at a time when his legal residence was in Miami, Florida. Wachovia Bank, N.A., f.k.a. First Union National Bank (Wachovia), was appointed personal representative of decedent's estate. At the time the petition was filed, Wachovia maintained a business office in Deerfield Beach, Florida, and its principal office in North Carolina.

Commercial Chemical Co. of Tennessee, a chemical manufacturing company, was incorporated on August 16, 1922, and Oleoke Corp. was incorporated on December 7, 1929, in Delaware. On or about October 4, 1937, Oleoke Corp. changed its name to Commercial Chemical Co. (CCC) and acquired the company's assets. Until 1974, CCC manufactured products, including calcium arsenate and arsenic acid. During 1974, CCC sold its chemical manufacturing business assets to an unrelated third party. Since that time, CCC's only activity has been to hold and manage investments for the benefit of its shareholders. CCC has at all relevant times been a C corporation for Federal income tax purposes.

CCC is closely held (through trusts) by related Jelke family members. On March 4, 1999, the date of decedent's death,

---

[2] The parties' stipulations of fact are incorporated by this reference.

decedent owned 3,000 shares of common stock (a 6.44-percent interest) in CCC through a revocable trust. The other CCC shareholders were irrevocable trusts holding interests in CCC ranging in size from 6.181 percent to 23.668 percent. The terms of the Jelke family trusts did not prohibit the sale or transfer of CCC stock.

Decedent held beneficial interests in three trusts in addition to the one holding the CCC stock to be valued. One of the three provided income for decedent's and his sisters' benefit and was to terminate upon the death of the last survivor. Decedent's sisters were 59 and 65 at the time of his death. A second trust provided income to decedent and his two sisters and was to terminate on March 4, 2019. Finally, a trust document created three more trusts with decedent and each of his two sisters as individual beneficiaries. Each of the separate trusts was to terminate upon the beneficiary's death, at which time the assets were to be distributed to the beneficiary's issue. Wilmington Trust Corp. (Wilmington Trust) was the trustee of all but one of the Jelke family trusts. The trusts for which Wilmington Trust was trustee collectively owned 77.186 percent of the outstanding stock of CCC, including decedent's 6.44-percent interest. From 1988 to the time of the trial in this case, there had been no sales or attempts to sell CCC stock.

CCC's portfolio was well managed by experienced individuals. Wilmington Trust provided custodial and advisory services at a charge of 0.26 percent of asset value, and a stockholder-elected board of directors (none of whom was a shareholder) managed CCC. The shareholders of CCC were not allowed to participate in the operation or management of CCC. In addition, the trust beneficiaries showed little interest in participating in CCC, attending about 12 board meetings over 20 years. Likewise, trust beneficiaries did not attend CCC stockholders meetings.

CCC's primary investment objective was long-term capital growth, resulting in low asset turnover and large unrealized capital gains. As of the date of decedent's death, CCC's board of directors had no plans to liquidate an appreciable portion of CCC's portfolio, and they intended to operate CCC as a going concern. The payment of dividends to CCC's shareholders steadily rose from $12.35 a share in 1974 to $34 a share in 1999. CCC's asset turnover for 1994 to 1998 was:

| 1994 | 1995 | 1996 | 1997 | 1998 |
|------|------|------|------|------|
| 6.74% | 5.06% | 4.66% | 9.80% | 3.48% |

CCC's net asset value increased from $59.5 million at the end of 1994 to $139.0 million at the end of 1998, corresponding to an average annual increase that exceeded 23 percent. On the date of decedent's death, the net asset value (assets less liabilities) of CCC was $188,635,833, as follows:

<u>Assets</u>

| | |
|---|---:|
| Marketable securities | $178,874,899 |
| Money market funds | 11,782,091 |
| Accounts receivable | 53,081 |
| Furniture and fixtures | 2,665 |
| Petty cash, misc. | 54,244 |
| Total assets | 190,766,980 |

<u>Liabilities</u>

| | |
|---|---:|
| General liabilities | 679,170 |
| Current income taxes | 1,451,977 |
| Total liabilities | 2,131,147 |
| Net assets | 188,635,833 |

CCC's securities portfolio, if sold on the valuation date, would have produced a capital gain tax liability of $51,626,884. The $188,635,833 net asset value, as of the date of decedent's death, did not include any reduction for any potential tax liability.

As of the date of decedent's death, the composition of CCC's securities portfolio was 92 percent domestic equities and 8 percent international equities. CCC's portfolio comprised mostly large-cap stocks, devoting only a small portion of its portfolio to emerging growth stocks. CCC benchmarked its large-cap portfolio holdings against the S&P 500 Index and its emerging growth portfolio holdings against the Russell 2000 Index. Securities held by CCC were all publicly traded. Market values for CCC's portfolio were readily available at nominal or no cost.

Among the larger holdings in this widely diversified portfolio of marketable securities were Exxon, General Electric, Hewlett Packard, Microsoft, and Pepsico.

On the estate's Federal estate tax return filed on December 6, 1999, $4,588,155 was included in the gross estate as representing the value of decedent's 6.44-percent interest in CCC (which decedent held through his revocable trust). The estate computed the $4,588,155 value by reducing CCC's $188,635,833 net asset value by $51,626,884 for built-in capital gain tax liability and then applying 20-percent and 35-percent additional discounts to decedent's stock interest for lack of control and marketability, respectively.

In the notice of deficiency issued to the estate, respondent, among other things, determined that the value of decedent's 6.44-percent interest in CCC was $9,111,111. Respondent indicated that this $9,111,111 value included "reasonable" discounts for lack of control and lack of marketability.

## OPINION

The primary question presented for our consideration concerns the fair market value of an interest in a closely held family corporation. Decedent held (through a trust) a 6.44-percent minority interest in the corporation. The corporation in this case is a holding company with a portfolio of widely traded

securities that have readily ascertainable values. Accordingly, the parties have agreed on the value of the subject corporation's assets. The controversy that remains involves the discounts or reductions from that agreed value. In addition to disagreement about control and marketability discounts, the parties differ as to the amount of the reduction from the value for the potential capital gain tax liability that would arise upon sale of the marketable securities held by the corporation. In particular, we must decide whether the value of the corporation should be reduced by the full amount of the built-in capital gain tax liability (as asserted by the estate) or by a lesser amount in which the reduction is based on the present value of the built-in capital gain tax liability discounted to reflect when it is expected to be incurred (as asserted by respondent).

A. The Burden of Proof

The estate contends that the burden of proof should shift to respondent under the provisions of section 7491(a)[3] on the issue considered by the Court.[4] Section 7491(a)(1) provides:

---

[3] All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[4] At trial, the estate filed a motion seeking to shift the burden to respondent. The Court intimated that it was not disposed to grant the estate's motion, but allowed the parties to further address this matter on brief. For the reason explained on the record and in this opinion, the estate's motion will be denied.

>     If, in any court proceeding, the taxpayer introduces
>     credible evidence with respect to any factual issue
>     relevant to ascertaining the liability of the taxpayer
>     for any tax imposed under subtitle A or B, the
>     Secretary shall have the burden of proof with respect
>     to such issue.

As a prerequisite to the shifting of the burden under section 7491(a) a taxpayer must: (1) Comply with statutory substantiation and record-keeping requirements, sec. 7491(a)(2)(A) and (B); (2) cooperate with reasonable requests by the Commissioner for "witnesses, information, documents, meetings, and interviews", sec. 7491(a)(2)(B); and (3) in cases of partnerships, corporations, and trusts, meet the net worth requirements set forth in section 7430(c)(4)(A)(ii), sec. 7491(a)(2)(C). Taxpayers bear the burden of showing that these requirements are met. Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001); H. Conf. Rept. 105-599, at 240 (1998), 1998-3 C.B. 747, 994; S. Rept. 105-174, at 45 (1998), 1998-3 C.B. 537, 581.

The estate contends that it has complied with or met the requirements and that it has presented credible evidence in the form of its expert's report and the stipulated facts and exhibits. The evidentiary posture presented in this case is similar to that in Estate of Deputy v. Commissioner, T.C. Memo. 2003-176. No fact witnesses were called to testify in this case. As in Estate of Deputy, the parties here have stipulated the operative facts and documents, and the testimony presented at trial consisted of the cross-examination of the parties' tendered

experts on their opinions on the question of value. In that regard, we note that the parties' experts' reports constitute opinion testimony, and such testimony is not fact for purposes of our ultimate findings. Accordingly, there exists no dispute about the underlying facts, and, ultimately, we are asked to decide the amount of reduction for built-in capital gain tax liability and the discounts for lack of marketability and control. In the setting of this case, those questions will be resolved on the basis of essentially agreed facts along with any assistance we may find helpful in the parties' experts' opinions, not on the basis of which party bears the burden of proof.

In such circumstances the question of who has the burden of proof or who should go forward with the evidence is irrelevant. See, e.g., Estate of Hillgren v. Commissioner, T.C. Memo. 2004-46; Estate of Green v. Commissioner, T.C. Memo. 2003-348; Estate of Deputy v. Commissioner, supra. Therefore, there is no need to decide whether the estate met the "credible evidence" requirement.

B. CCC's Value on March 4, 1999

The controversy presented for our decision concerns the value of a 6.44-percent interest in CCC, a corporation closely held by the Jelke family. For estate tax purposes, property includable in decedent's gross estate is generally valued as of the date of death. See sec. 2001. The fair market value is

determined by considering the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts.  Sec. 20.2031-1(b), Estate Tax Regs.  The determination of the fair market value of property is a factual determination, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 294 (1938); Symington v. Commissioner, 87 T.C. 892, 896 (1986); sec. 20.2031-1(b), Estate Tax Regs.

The determination of the fair market value of a closely held (unlisted) stock may be effectively established by reference to arm's-length sales of the same stock within a reasonable time before or after the valuation date.  See, e.g., Ward v. Commissioner, 87 T.C. 78, 101 (1986).  Absent an arm's-length sale, fair market value is normally determined using the hypothetical willing buyer and seller model.  Estate of Hall v. Commissioner, 92 T.C. 312, 335-336 (1989).  Implicit in that model is the axiom that the seller would attempt to maximize profit and the buyer to minimize cost.  Estate of Curry v. United States, 706 F.2d 1424, 1429 (7th Cir. 1983); Estate of Newhouse v. Commissioner, 94 T.C. 193 (1990).

The particular aspect of the valuation question we consider here concerns the reduction for potential tax liability for gains "built in" to the securities held in CCC's corporate solution. The estate contends that the market value of CCC's holdings should be reduced by the entire amount of the built-in capital gain tax liability that would be due if all of the assets (securities) were sold as of decedent's date of death. Respondent, admitting that there should be a discount or reduction,[5] contends that the potential tax liability should be discounted in accordance with time value of money principles.

The estate attempts to support its position through an expert who purports to use a net asset approach to valuation, which the estate contends requires an assumption of liquidation on the valuation date.[6] The estate relies on the rationale of an appellate court to which appeal would not normally lie in this case. Respondent attempts to support his position through an expert who contends that an assumption of liquidation is not

---

[5] Because the built-in capital gain tax liability is a corporate liability, it reduces the total value of the corporation. The parties here and some courts have described the built-in capital gain tax liability as something to be considered in the process of discounting the value of the interest being valued. In this case we treat the built-in capital gain tax liability as a liability that reduces the value of the assets before the consideration of discounts from the value of the interest for lack of control or marketability.

[6] If CCC were liquidated on the valuation date, it would essentially be selling readily marketable securities that would result in long-term capital gains and tax liability thereon.

appropriate in this case and that the tax liability for the capital gain should be calculated on the basis of CCC's established history of securities turnover.  We agree with respondent.  However, before we delve into the parties' arguments and their experts' opinions, it is helpful to review the legal history of the effect of built-in capital gain tax liability in the valuation of corporations.

Before 1986, this Court recognized that gain on appreciated corporate assets could be avoided at the corporate level under the principles of the General Utilities doctrine.[7]  That doctrine was based on the holding in Gen. Utils. & Operating Co. v. Helvering, 296 U.S. 200 (1935), that there would be no recognition by the distributing corporation of inherent gain on appreciated corporate property that was distributed to shareholders.  Accordingly, a corporation could distribute its appreciated property to shareholders or liquidate without paying capital gain tax at the corporate level.

On the basis of that understanding and before 1986, this Court consistently rejected taxpayers' attempts to discount the value of a corporation on the basis of any inherent capital gain tax liability on appreciated corporate property.  See, e.g., Estate of Piper v. Commissioner, 72 T.C. 1062, 1087 (1979);

---

[7] The General Utilities doctrine, as codified in former secs. 336 and 337, was repealed by the Tax Reform Act of 1986, Publ. L. 99-514, sec. 631(a), 100 Stat. 2269.

Estate of Cruikshank v. Commissioner, 9 T.C. 162, 165 (1947).
Indeed, only in rare instances before the repeal of the General
Utilities doctrine did courts consider a built-in tax liability
in deciding the value of a corporation.  See, e.g., Obermer v.
United States, 238 F. Supp. 29, 34-36 (D. Hawaii 1964).

    Since the repeal of the General Utilities doctrine, this
Court has, on several occasions, considered the impact of built-
in capital gain tax liability in valuing corporate shares.  Our
approach to adjusting value to account for built-in capital gain
tax liability has varied and has often been modified or overruled
on appeal.  See, e.g., Estate of Davis v. Commissioner, 110 T.C.
530, 552-554 (1998); Estate of Dunn v. Commissioner, T.C. Memo.
2000-12, revd. 301 F.3d 339 (5th Cir. 2002); Estate of Jameson v.
Commissioner, T.C. Memo. 1999-43, revd. 267 F.3d 366 (5th Cir.
2001); Estate of Welch v. Commissioner, T.C. Memo. 1998-167,
revd. without published opinion 208 F.3d 213 (6th Cir. 2000);
Eisenberg v. Commissioner, T.C. Memo. 1997-483, revd. 155 F.3d 50
(2d Cir. 1998); Gray v. Commissioner, T.C. Memo. 1997-67.

    In one case, we held that a discount for built-in capital
gain tax liability was appropriate because even though corporate
liquidation was unlikely, it was not likely the tax could be
avoided.  See Estate of Davis v. Commissioner, supra.  However,
this Court has not invariably held that discounts or reductions
for built-in capital gain tax liability were appropriate where it

had not been shown that it was likely the corporate property would be sold and/or that the capital gain tax would be incurred. See, e.g., Estate of Welch v. Commissioner, supra; Eisenberg v. Commissioner, supra; Gray v. Commissioner, supra.

Appellate courts in two of these cases reversed our decisions that a reduction in value for built-in capital gain tax liability was inappropriate. The Court of Appeals for the Second Circuit reasoned that, although realization of the tax may be deferred, a willing buyer would take some account of the built-in capital gain tax. Eisenberg v. Commissioner, 155 F.3d at 57-58. Likewise, the Court of Appeals for the Sixth Circuit disagreed with our specific holding that the potential for a capital gain tax liability was too speculative. Estate of Welch v. Commissioner, supra. The Court of Appeals for the Sixth Circuit, to some extent, agreed with the Court of Appeals for the Second Circuit's approach in Eisenberg. Neither the Court of Appeals for the Second Circuit nor the Court of Appeals for the Sixth Circuit prescribed the amount of reduction or a method to calculate it.

The Commissioner has since conceded the issue of whether a reduction for capital gain tax liability may be applied in valuing closely held stock by acquiescing to the Court of Appeals for the Second Circuit's decision in Eisenberg. See 1999-1 C.B. xix. In addition, in this case the parties agree and we hold

that a reduction for built-in capital gain tax liability is appropriate. However, controversy continues with respect to valuing such a reduction. In two such cases involving the question of valuing reductions for built-in capital gain tax liabilities, the Court of Appeals for the Fifth Circuit has reversed our holdings. See Estate of Dunn v. Commissioner, supra; Estate of Jameson v. Commissioner, supra.

In Estate of Jameson, the decedent held a controlling interest in a corporation that generated income primarily through the sale of appreciated timber. The corporation in Estate of Jameson focused on future appreciation in value, and there was no intent to liquidate the corporation as of the valuation date. This Court held that the fair market value was best determined using the asset approach because the company was a holding company rather than an operating company. We also held that the net asset value should be reduced for built-in capital gain tax liability because of a section 631(a) election that ensured that gain would be recognized irrespective of whether the corporation was liquidated. We further held that the amounts of capital gain tax to be recognized in future years were to be discounted to present values by assuming a 14-percent overall rate of return and a 20-percent discount rate of future cashflows.

The Court of Appeals for the Fifth Circuit reversed our holding, commenting that the application of a 20-percent discount rate while assuming no more than a 14-percent annual growth was "internally inconsistent". Estate of Jameson v. Commissioner,

267 F.3d at 372. The Court of Appeals also pointed out that, in its view, an assumption that a hypothetical buyer would operate a company whose expected growth was less than the buyer's required return was fatally flawed. Id.

In Estate of Dunn v. Commissioner, supra, the decedent owned a majority interest in a corporation primarily engaged in renting out heavy construction equipment. This Court, in deciding the value of the corporation, assumed that a hypothetical buyer and seller would give substantial weight to an earnings-based approach because the corporation was an operating company. This Court also gave some weight to an asset-based approach because the corporation's earnings projections were based on an atypically poor business cycle that would have produced an unreasonably low value. In accord with that reasoning, this Court used a 35-percent/65-percent combination of a cashflow earnings-based approach and an asset-based approach, respectively, to value the company. By using that combination of the two approaches, we rejected the estate's expert's sole reliance on an asset-based approach, where he assumed a liquidation on the valuation date and reduction for the entire amount of potential built-in capital gain tax liability. Although the capital gain tax rate at the corporate level was 34 percent, this Court used a 5-percent reduction for the built-in capital gain tax liability in the asset-based portion of the value computation to account for the lower likelihood of liquidation.

The Court of Appeals for the Fifth Circuit, in reversing our holding in Estate of Dunn, held that the use of an asset-based approach to value assets generally assumes a sale of all corporate assets or a liquidation of the corporation on the valuation date, requiring a dollar-for-dollar reduction for the entire built-in capital gain tax liability as a matter of law. Estate of Dunn v. Commissioner, 301 F.3d at 351-353.[8] The Court of Appeals also concluded that the likelihood of liquidation had no place in a court's decision as to whether there should be a reduction for built-in tax liability under either the asset-based approach or the earnings-based approach. Id. at 353-354. The Court of Appeals did indicate, however, that the likelihood of liquidation would be relevant in assigning relative weights to the asset and earnings approaches where both methods would be used to determine value. Id. at 354-357.

With that background, we proceed to consider the circumstances and arguments in this case. The estate reported $4,588,155 as the discounted value of the CCC interest. Respondent determined that the discounted value of the CCC interest was $9,111,111. Although the estate's expert, Mr. Frazier, concluded that the discounted value of the CCC interest was $4,301,000, the estate is not seeking a value less than that reported on the estate tax return. Likewise, respondent relies

---

[8] However, the Court of Appeals for the Fifth Circuit stated that consideration of built-in capital gain would be inappropriate in an earnings-based approach to value.

on his expert's, Mr. Shaked's, discounted value of $9,225,837 but does not seek to increase the amount determined in the notice of deficiency.

We are not constrained to follow an expert's opinion where it is contrary to the Court's own judgment, and we may adopt or reject expert testimony. Helvering v. Natl. Grocery Co., 304 U.S. at 295; Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976) (and cases cited thereat), affg. T.C. Memo. 1974-285.

In attempting to value the interest in CCC, the estate's expert, Mr. Frazier, considered the three traditional valuation approaches--income, market, and asset. Under the income approach, value is determined by computing a company's income stream. Under the market approach, value is determined by comparison with arm's-length transactions involving similar companies. Finally, under the asset approach, value is determined by computing the aggregate value of the underlying assets as of a fixed point in time.

After discussing several methods, Mr. Frazier used what he described as a combination of the market and asset approaches. Mr. Frazier used the market approach to value CCC's securities. Purporting to rely on the asset approach to valuation, Mr. Frazier then reduced the total of the market prices for CCC's securities by the liabilities shown on CCC's books and the tax liability that would have been incurred if all of CCC's securities had been sold on decedent's date of death. Mr. Frazier did not make adjustments to the tax liability for the

possibility that sales of CCC's securities would have occurred after decedent's date of death.  In other words, Mr. Frazier relied on the net asset method to employ an assumption of liquidation as of the valuation date, an event which would trigger recognition of $51,626,884 in capital gain tax.  This method produced a $137,008,949 million value for CCC.  Mr. Frazier then computed an undiscounted value of $8,823,062 for decedent's 6.44-percent interest (3,000 of 46,585.51 shares) held in trust.

Respondent's expert, Mr. Shaked, started with the same market value of CCC's securities.  Mr. Shaked then reduced the assets by liabilities, but he used a different approach from Mr. Frazier's in arriving at a reduction for the built-in capital gain tax liability.  First, he computed CCC's average securities turnover by reference to the most recent data (1994-98).  Using that data, Mr. Shaked computed a 5.95-percent average annual turnover derived from the parties' stipulated asset turnover rates for 1994-98.  Mr. Shaked believed that the 5.95-percent rate was conservative,[9] because the turnover trend was generally decreasing.  The use of the 5.95-percent turnover rate results in the capital gain tax's being incurred over a 16.8-year period (100 percent divided by 5.95 percent).

Mr. Shaked then divided the $51,626,884 tax liability by 16 years to arrive at the average annual capital gain tax liability

---

[9] The use of a higher turnover rate would increase capital gain tax and decrease the value of decedent's CCC shares.

that would have been incurred each year over this 16-year period--$3,226,680.25 ($51,626,884 divided by 16).  Next, he selected a 13.2-percent discount rate based on the average annual rate of return for large-cap stocks in the period from 1926 to 1998, as described in Ibbotson Associates Stocks, Bonds, Bills & Inflation, 1999 Yearbook (Ibbotson 1999).  He then computed the present value of the $3,226,680.25 annual tax liability discounted over 16 years using a 13.2-percent interest rate to arrive at a present value for the total capital gain tax liability of $21,082,226.  By reducing the $188,635,833 net asset value by the $21,082,226 future tax liability, Mr. Shaked arrived at a $167,553,607 value for CCC.  Finally, Mr. Shaked concluded that the undiscounted value for decedent's 6.44-percent interest in CCC was $10,789,164 in contrast to Mr. Frazier's undiscounted value of $8,823,062.  This difference reflects numerically the parties' differing approaches to the amount of capital gain tax that should be used to reduce the net asset value of CCC.

A hypothetical buyer of CCC is investing in a composite portfolio to profit from income derived from dividends and/or appreciation in value.  A hypothetical buyer of CCC is, in most respects, analogous to an investor/buyer of a mutual fund.  The buyer is investing in a securities mix and/or performance of the fund and would be unable to liquidate the underlying securities.  That is especially true here where we consider a 6.44-percent

investor who, inherently, is unable to cause liquidation.[10]  In addition, the record reveals that there was no intention of the trusts or the Jelke family shareholders to liquidate.  A hypothetical buyer of a 6.44-percent interest in CCC is in effect investing in the potential for future earnings from marketable securities.  A hypothetical seller of CCC shares likewise would not accept a price that was reduced for possible tax on all built-in capital gain knowing that CCC sells or turns over only a small percentage of its portfolio annually.  In that regard, the record reflects that CCC had a long-term history of dividends and appreciation, with no indication or business plan reflecting an intention to liquidate.  In addition, as of the 1999 valuation date, one of the trusts holding CCC shares was designed so as not to terminate before 2019, and none of the CCC shareholders had sold or planned to sell their interests.  These factors belie the use of an assumption of complete liquidation on the valuation date or within a foreseeable period after the valuation date.

The estate contends that its approach and assumption of complete liquidation is supported by the holding in Estate of Dunn v. Commissioner, 301 F.3d 339 (5th Cir. 2002).  In particular, the estate argues that the holding of the Court of Appeals for the Fifth Circuit requires that an asset-based

---

[10] Even if we were considering the value of a majority interest in CCC, a hypothetical buyer would not purchase the shares and then sell the stock to realize the net asset value, less the built-in capital gain tax liability.  All of the securities held by CCC could have been acquired on the open market without built-in capital gains.

approach (as opposed to an income approach) include the assumption that the assets were sold on the valuation date, regardless of whether the company was contemplating liquidation. Accordingly, the estate argues that the value of CCC should be reduced by the entire $51,626,884 tax liability for built-in capital gain.

The case we consider here would not normally be appealable to the Court of Appeals for the Fifth Circuit. We are not bound by or compelled to follow the holdings of a Court of Appeals to which our decision is not appealable. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). More significantly, there is some question whether the Court of Appeals for the Fifth Circuit would require a liquidation assumption when valuing a minority interest. In that regard, the Court of Appeals tempered its holding in Estate of Dunn by explaining that if it were valuing a minority ownership interest, a business-as-usual assumption or earnings-based approach may be more appropriate. See Estate of Dunn v. Commissioner, 301 F.3d at 353 n.25.

The Court of Appeals' reasoning and holding in Estate of Dunn applied to a majority interest. There is no need to express agreement or disagreement with the automatic use of an assumption of liquidation when using an asset-based approach to value a majority interest, because we are valuing a small minority interest. To that extent, our holding here may be factually and legally distinguishable from the holding in Estate of Dunn.

Accordingly, and unlike the situation in Estate of Dunn, decedent's 6.44-percent interest in CCC would be insufficient to cause liquidation.

The estate also argued that CCC's relatively low earnings and modest dividends would cause a hypothetical buyer to prefer liquidation. We are unpersuaded by the estate's supposition, which is contradicted by the record in this case. CCC performed well and kept pace with the S&P 500, defying the notion that it is an underperforming company. An investor may seek gain from dividends, capital appreciation, or a combination of the two. Accordingly, we hold that neither the circumstances of this case nor the theory or method used to value the minority interest in CCC requires an assumption of complete liquidation on the valuation date.[11]

Having held that an assumption of complete liquidation on the valuation date does not apply in this case, we must consider the amount of the reduction to be allowed for the built-in capital gain tax liability. Respondent's expert began with the total amount of built-in capital gain tax liability ($51,626,884); and after determining when the tax would be incurred, he discounted the potential tax payments to account for time value principles. The estate attacks that approach by

[11] We also note that we do not assume a rate of return lower than our discount rate, as we were said to have done in Estate of Jameson v. Commissioner, 267 F.3d 366, 372 (5th Cir. 2001), revg. T.C. Memo. 1999-43. Accordingly, our assumption of continuing operations is not "internally inconsistent". Id.

contending that CCC's securities will appreciate, increasing the future tax payments and thereby obviating the need to discount.

The estate's expert, in an effort to support this theory, testified that if the premise is that the liquidation or sale of substantially all of a corporation's assets would occur in the future, there should also be:

> a long term projection * * * that the stock will appreciate. If the stock appreciates, the capital gains tax liability will appreciate commensurate [sic]. The present value of the capital gains tax liability will be the same. Only if you assume there's no appreciation in the stock would you discount the capital gains tax. And that's a completely unreasonable assumption.

Thus, the estate through its expert, Mr. Frazier, contends that irrespective of the unlikelihood of liquidation there should be a dollar-for-dollar decrease for the built-in capital gain tax liability, representing the present value of that liability because the liability will increase over time. In that regard, the estate argues that Mr. Shaked incorrectly assumed that the stock would not appreciate.

In addressing this argument, Mr. Shaked explained that the need to discount the built-in capital gain tax liability is analogous to the need to discount carryforward losses because they cannot be used until years after the valuation year. Mr. Shaked's approach is to calculate the built-in capital gain tax liability by determining when it would likely be incurred. We

agree with Mr. Shaked's approach of discounting the built-in capital gain tax liability to reflect that it will be incurred after the valuation date.

Because the tax liabilities are incurred when the securities are sold, they must be indexed or discounted to account for the time value of money. Thus, having found that a scenario of complete liquidation is inappropriate, it is inappropriate to reduce the value of CCC by the full amount of the built-in capital gain tax liability. See Estate of Davis v. Commissioner, 110 T.C. at 552-553.[12] If we were to adopt the estate's reasoning and consider future appreciation to arrive at subsequent tax liability, we would be considering tax (that is not "built in") as of the valuation date. Such an approach would establish an artificial liability. The estate's approach, if used in valuing a market-valued security with a basis equal to its fair market value, would, in effect, predict its future appreciated value and tax liability and then reduce its current fair market value by the present value of a future tax liability.

In that same vein, the estate argues that the Government, in other valuation cases, has offered experts who computed the capital gain tax on the future appreciated value of assets and discounted the tax to a present value for purposes of valuing a corporation. In one of those cases, the Court was valuing a

---

[12] See also Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 135.3.8, at 135-149 (2d ed. 1993 and supp. 2004).

corporation that owned rental realty (shopping centers). Estate of Borgatello v. Commissioner, T.C. Memo. 2000-264. As part of a weighting of factors to arrive at a discount, the Commissioner's expert calculated the potential for appreciation in the real estate market and the amount of built-in capital gain tax liability. This Court, to some extent, relied on the expert's methodology in its holding on value. In the other case relied upon by the estate, although the Commissioner's expert advanced a similar analysis, this Court rejected that expert's approach as an unsubstantiated theory. Estate of Bailey v. Commissioner, T.C. Memo. 2002-152.

The guidance of the expert was rejected in one of the cases cited by petitioner and was part of a discounting approach to assist the finder of fact (Court) to decide upon a discounted value in the other case. Although the expert's guidance in the latter case was considered in reaching a factual finding, the expert's approach does not represent the ratio decidendi of the case. In our consideration of the value of the marketable securities in this case, we are not bound to follow the same approach used by an expert in other cases. More significantly we do not find that approach to be appropriate in this case. Therefore, we find that in valuing decedent's 6.44-percent interest, CCC's net asset value need not be reduced by the entire $51,626,884 potential for built-in capital gain tax liability and that future appreciation of stock need not be considered. We find Mr. Shaked's use of a 13.2-percent discount rate to be

reasonable.[13]  In addition, the turnover rate of securities used by Mr. Shaked is conservative and reasonable under the circumstances.  The asset turnover rate reasonably predicts the period over which the company's assets will be disposed of and thus built-in capital gain tax liability would likely be incurred.  Consequently, we find it appropriate to use a 16-year period of recognition for the tax liability attributable to the built-in capital gain.  We therefore accept Mr. Shaked's computation arriving at a $3,226,680.25 annual tax liability and a discounted total liability of $21,082,226.

We accordingly hold that the undiscounted value of CCC on the date of decedent's death was $167,553,607 ($188,635,833 - $21,082,226).  This holding results in an 11.2-percent reduction in value for built-in capital gain tax liability ($21,082,226 divided by $188,635,833 equals 11.2 percent).

C.  Discounts To Be Applied

1.  Discount for Lack of Control

Decedent's 6.44-percent (minority) interest in CCC must be discounted for lack of control.  The estate's expert, Mr.

---

[13] We recognize that a discount rate would normally be a matter of negotiation between a willing buyer and seller.  The estate, in its posttrial briefs, agrees that Mr. Shaked's discount rate is an appropriate rate if we were to discount the built-in capital gain tax liability.  Because the estate agrees with this rate and the parties have provided no further evidence with regard to a discount rate, we give no further consideration to this matter.

Frazier, discounted decedent's CCC interest by 25 percent for lack of control.  Respondent's expert, Mr. Shaked, applied a 5-percent discount.

Mr. Frazier compared CCC to a closed-end and not widely traded investment fund holding publicly traded securities.  He believed that CCC and a closed-end fund both have a fixed amount of assets for trading, unlike open-end investment funds (mutual funds).  Because closed-end funds are flowthrough entities taxed only at the shareholder level,  Mr. Frazier concluded that the discounts reflected in those funds did not include any reduction for built-in capital gain tax liability.  Likewise, because closed-end funds are typically publicly traded, none of the discount inherent in those funds would be attributable to lack of marketability.

With those assumptions, Mr. Frazier reviewed 44 domestic equity security funds and selected 15 that he believed were comparable.  He removed eight companies from the 15 because, unlike CCC, they had guaranteed payouts.  The remaining seven companies had an average discount rate of 14.8 percent as of March 4, 1999.  The funds' discounts and returns compared with those of CCC, as computed by Mr. Frazier, are reflected in the following table:

| Company | Discount | Market Total Return | | | |
|---|---|---|---|---|---|
| | | 3-month | 1-year | 3-year | 5-year |
| Morgan Grenfell | 19.2% | 39.3% | 45.5% | 18.4% | 22.1% |
| Central Securities | 17.3 | 17.0 | 23.9 | 13.9 | 21.7 |
| Tri-Continental | 17.3 | 4.9 | 11.2 | 21.4 | 22.7 |
| Adams Express | 17.2 | 17.5 | 27.6 | 26.4 | 24.9 |
| Royce Micro Cap | 17.0 | 8.7 | 4.1 | 8.4 | 11.7 |
| General American Inv. | 8.5 | 24.2 | 38.7 | 37.1 | 30.0 |
| Salomon Bros. | 7.3 | 23.6 | 34.7 | 28.8 | 33.8 |
| | | | | | |
| Average | 14.8 | 19.3 | 26.5 | 22.1 | 23.8 |
| 75th percentile | 17.3 | 23.9 | 36.7 | 27.6 | 27.5 |
| Median | 17.2 | 17.5 | 27.6 | 21.4 | 22.7 |
| | | | | | |
| CCC | 25.0 | 6.0 | 17.8 | 25.1 | 22.9 |

Next, Mr. Frazier eliminated lower discounted funds (General American and Salomon Brothers) because he concluded the low discounts were due to the consistently high returns of those companies.  Mr. Frazier believed that CCC's performance was most similar to those of the funds in the upper end of the discount spectrum (Morgan Grenfell, Central Securities, and Tri-Continental), because of CCC's inconsistent returns and small size.  Finally, he concluded that CCC was comparable to Morgan Grenfell, because its assets were slightly less than CCC's and Central Securities' and Tri-Continental's assets were much larger.

Ultimately, Mr. Frazier concluded that an investor would demand a higher rate of return or a larger discount than for the comparable companies, because:  (1) CCC had fewer assets than almost all comparables; (2) CCC paid fewer dividends than the average of all comparable companies (excluding Morgan Grenfell, which did not pay dividends) but paid dividends in amounts

similar to those of non-guaranteed-payout comparables; and (3) the companies without guaranteed dividend payouts, on average, outperformed CCC in the short term (3-month and 1-year returns). Mr. Frazier compared CCC to the upper quartile of companies (Morgan Grenfell and Central Securities), noting that the average discount rate was 18.3 percent and the performance was as follows:

|  | 3 Months | 1 year | 3 years | 5 years |
|---|---|---|---|---|
| Upper quartile | 28.1% | 34.7% | 16.2% | 21.9% |
| CCC | 6.0 | 17.8 | 25.1 | 22.9 |

In the final analysis, Mr. Frazier concluded that a hypothetical buyer would seek a lack-of-control discount of 25 percent, which comprised 20 percent on the basis of the comparables he selected and an additional 5 percent because of other less significant dissimilarities with CCC.

In contrast, Mr. Shaked applied a 5-percent discount for lack of control. His analysis began with an average discount (8.61 percent) for closed-end funds that he obtained from an article in the Journal of Economics. Mr. Shaked considered CCC a well-managed holding company with a diversified portfolio of marketable securities. Accordingly, he believed that management decisions, which are more critical in certain types of operating companies, were less relevant and that a hypothetical buyer/investor of CCC stock would be less concerned about lack of control. It was also Mr. Shaked's view that an investor in CCC, much like investors of mutual funds, would prefer not to have

control, making a lack-of-control discount less significant. In that regard, Mr. Shaked noted that the beneficial owners of the shares of CCC were not managers of CCC or members of its board of directors.

Both experts agreed that there was an inverse relationship between a company's financial performance and a lack-of-control discount. In other words, as performance improves the discount decreases. The parties, however, disagree about CCC's performance. Respondent argues that CCC outperforms many of the 15 comparables used by Mr. Frazier, if considered over a 3-, 5- and 10-year period. Conversely, the estate, for the same period, argues that CCC has underperformed the S&P 500 and most of the final seven comparables selected by Mr. Frazier. We believe that CCC has a good performance record. Accordingly, we agree to some extent with Mr. Shaked's observation that control would be less important for CCC.

Mr. Shaked, in support of his 5-percent discount for lack of control, provided the generalized explanation that CCC was similar to a closed-end holding company. Mr. Frazier provided more detail and analysis in support of his 25-percent discount for lack of control, but some of his analysis overlooks important aspects and, to some extent, is inconsistent.

First, Mr. Frazier's reasoning in using some of the comparables is flawed. He did not provide adequate justification for eliminating Tri-Continental and Adams Express as comparables. In addition, he ignored the fact that Royce Micro Cap and Morgan

Grenfell Smallcap held investments in small-cap funds and that Central Securities Corp. held less diversified investments. Both strategies would appear riskier than CCC's strategy of investing in a diversified base of large-cap stocks and limiting its holdings to no more than 25 percent of its total assets in a single industry. CCC's investment strategy was more comparable to that of a diversified stock fund like Salomon Brothers Fund, which invested in listed NYSE securities. We note that in Mr. Frazier's analysis, Salmon Brothers Fund was discounted only 7.3 percent.

We also note that Mr. Frazier did not justify or adequately explain why he limited his comparison to the two funds with the highest discounts (18.3-percent average). We find it curious that his analysis purports to compare CCC to either three or seven companies, when actually the final universe he selected was smaller. We also note that Mr. Frazier did not explain or justify increasing the discount rate from the 18.3-percent average of these two to 20 percent. Finally, though Mr. Frazier did show that CCC's short-term rate of return was lower than those of the selected companies, CCC had a long-term investment strategy and, on average, out-performed the comparables in that respect.

In addition, we are unable to agree with Mr. Frazier's assumption that the discounts reflected in the comparable companies he selected are due solely to lack of control. Part of the discount may be due to lack of marketability. In that

regard, Mr. Frazier acknowledges that "lack of the ability to liquidate [is an] investment characteristic shared by * * * publicly-traded closed-end investment funds [and] closely-held corporations."  Lack of liquidity, however, is a marketability factor and should not be considered in connection with lack of control.  Further, other factors relating to the comparables could cause them to trade at a discount, such as a riskier investment strategy as described above, uncertain management, or some company-specific risk.[14]

Nevertheless, we generally agree that there are similarities between closed-end funds and CCC.  Like CCC, closed-end funds operate with a finite amount of capital, and they cannot increase or decrease the size of their portfolios.  This reduced flexibility in comparison to traditional mutual funds may warrant some discount in price for the increased risk, and although it is difficult to categorize this discount, it could fit within the concept of lack of control.  However, it is difficult to quantify the amount of discount that is attributable to lack of control.

Although we are not convinced that the discounts reflected in the funds Mr. Frazier compared to CCC were due solely to lack of control, we note that Tri-Continental, Adams Express, General

---

[14] For example, some funds that have above-average performance trade at a premium, indicating that even though investors do not control closed-end funds, some company-specific factors such as an expectation of future performance are considered in the fund's price relative to its net asset value. See Malkiel, "The Valuation of Closed-End Investment Company Shares".  J. Fin. 851 (June 1977).

American, and Salomon Brothers had investment strategies similar to CCC's. CCC's focus was long-term capital growth and it did not have a guaranteed dividend payout. However, the amount of discount in these comparable funds that is due to lack of control, rather than some other factor, is speculative. We also note that while CCC performed well, it did not perform as well as some of the comparables. In addition, CCC was relatively small compared to the comparable investment funds. CCC had a $167 million value compared to billions of dollars in many of the comparables.

On the other hand, CCC was well diversified, reducing the investment risk. In addition, investors in CCC would be less inclined to desire control because of the passive nature of an investment in this kind of company and its established long-term performance of good returns. Considering all of these factors, we hold that a 10-percent lack-of-control discount is appropriate.

2. Discount for Lack of Marketability

A discount for lack of marketability addresses liquidity or the ability to convert an asset into cash. See, e.g., Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. 91 F.3d 124 (3d Cir. 1996). When valuing stock, we assume that the buyer and seller each have "reasonable knowledge of the relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.

Mr. Frazier used a 35-percent and Mr. Shaked used a 10-percent discount for lack of marketability. Mr. Frazier

considered studies of operating companies with a minimum restriction on resale of at least 2 years. Although he acknowledged that operating companies are inherently riskier than holding companies, Mr. Frazier believed that the marketability discount for CCC was comparable to those of operating companies because CCC was not expected to liquidate for at least 20 years.[15] He relied on Rev. Rul. 77-287, section 6.02, 1977-2 C.B. 319, 321-322, for the proposition that "the longer the buyer of the shares must wait to liquidate the shares, the greater the discount."

Mr. Frazier believed that the studies he considered showed that the following factors were relevant to a marketability discount: Company revenues, company profitability, company value, the size of the interest being valued, the company's dividend policy, whether the company is an operating or investment company, and the likelihood the company will go public. On the basis of CCC's value, revenues, profitability, and the size of the interest being valued, Mr. Frazier observed that comparable discounts ranged anywhere from 14 percent to more than 35 percent. Mr. Frazier believed that CCC's dividend-paying policy and the fact it was an investment company favored an

---

[15] We must note that Mr. Frazier reduces CCC's asset value by the entire $51,626,884 built-in capital gain tax liability on the assumption of a liquidation on the valuation date, whereas for purposes of his lack of marketability analysis he relies on the premise that CCC will not be liquidated for at least 20 years. In each instance, the approaches, although internally inconsistent, produce the best results for his client (the estate).

average to below-average discount, while the long 20-year holding period of CCC shares and the fact that there was no likelihood of CCC's going public favored a higher discount for CCC. On the basis of an analysis of all these factors, Mr. Frazier applied a 35-percent discount rate for lack of marketability.

Mr. Shaked applied a 10-percent discount rate based on his analysis of the factors described in Mandelbaum v. Commissioner, supra. The nine factors used in the Mandelbaum case to analyze the discount were: (1) Financial statement analysis, (2) dividend policy, (3) outlook of the company, (4) management of the company, (5) control factor in the shares to be purchased, (6) company redemption policy, (7) restriction on transfer, (8) holding period of the stock, and (9) costs of a public offering.

Mr. Shaked began his analysis with the assumption that 20 percent was an average discount and then applied the factors in the Mandelbaum case to arrive at a 10-percent discount. Mr. Shaked considered the fact that the securities held by CCC were readily marketable in arriving at his discount. He believed that CCC's well-diversified portfolio resulted in low price volatility and was a factor in applying a low discount for marketability. In addition, since CCC's assets were marketable securities, it would be easier to find a willing buyer for this company than for a riskier company whose performance was more speculative.

Respondent contends that Mr. Frazier's assessment of restrictions on transferability is misguided, arguing that an expectation not to liquidate for another 20 years is different

from a restriction on transferability; and that while sales cannot take place in the public market, they can in the private market. Mr. Frazier's analysis was based on publicly traded securities with restrictions on resale to which the quotation from the revenue ruling referred. However, because CCC was a closely held company with no restrictions on transfer, investors would not be "locked" into this investment. Despite those important distinctions, restricted stock resales provide a limited amount of guidance on the question of lack of marketability. In particular, the studies concerned actual resales of the stock in a private market setting as compared to the price of publicly traded counterparts. Thus, while there were restrictions on selling the stock in a market transaction, there were no restrictions on private transfers.

Respondent contends that the companies examined in the restricted stock studies are not comparable because many of them were unprofitable or riskier than CCC. Mr. Frazier studied sales of stock of a number of companies. He acknowledges that a significant number of those companies reported a loss prior to the sale of that company's stock. Studies that focused on profitable companies, however, resulted in 22- to almost 35-percent discounts, whereas the studies of unprofitable companies which respondent contends are not comparable had lower discounts ranging from 14 to 25 percent.

Finally and despite the estate's assertions to the contrary, respondent contends that there is a market for CCC shares. While

none of the shareholders had a buyback agreement with CCC allowing them to have their shares redeemed, the minutes of CCC's board of directors indicate that the corporation did maintain a sufficient cash position in the event that the estate requested redemption of its shares. This, however, does not show that there is a public market for these shares, nor does it show that a hypothetical willing buyer would have a market for these shares.

We disagree with some of Mr. Shaked's analysis of the factors from the Mandelbaum case. The holding period of the CCC stock is different from the holding period of the underlying assets. Therefore, we find unfounded Mr. Shaked's assertion that the holding period of CCC stock is trivial because it can liquidate its assets (stock holdings). In addition, Mr. Shaked's discussion of the marketability of the underlying assets presents a different question from the marketability of CCC. An owner of CCC stock cannot purchase and sell securities in CCC's portfolio. Finally, the estate is correct in noting that consideration of the public offering factor should bear on the costs incurred if the company decided to go public. See Mandelbaum v. Commissioner, T.C. Memo. 1995-255. Therefore, Mr. Shaked's analysis on this factor was somewhat flawed.

Both parties make critical errors in their assumptions and analysis concerning the appropriate marketability discount. We generally find their analysis to be only minimally helpful, and, accordingly, we use our own analysis and judgment, relying on the

experts' or parties' assistance where appropriate.  See <u>Helvering v. Natl. Grocery Co.</u>, 304 U.S. at 295; <u>Silverman v. Commissioner</u>, 538 F.2d at 933.

We find the factors considered in <u>Mandelbaum v. Commissioner</u>, <u>supra</u>, to be a helpful guide to approaching the question of the amount of marketability discount.  We are unable to give any weight to studies involving the companies Mr. Frazier deemed comparable, because they were not sufficiently similar to provide us with meaningful guidance regarding CCC.  We do agree with respondent that CCC's financial performance justifies a lower-than-average discount for lack of marketability.  The discount should be lower than average, even though CCC's dividends were lower than those of similar companies, because it had a successful history of long-term appreciation.  Because CCC is a holding company with a diversified spectrum of marketable blue chip securities, its performance is relatively reliable and easily verified.

CCC's financial outlook should also favor a lower-than-average discount because there is no indication that CCC's portfolio or performance will change from its currently and historically successful course.  CCC's management, as stipulated by the parties, has performed well, a factor in favor of a lower-than-average discount.  The lack of control in the subject shares should not cause the discount to vary significantly from the average because a buyer of a 6.44-percent interest in CCC would

not be interested in control.  Because there are no restrictions on the transferability of CCC shares, that factor would favor a lower-than-average discount.

The holding period for CCC stock would favor a higher-than-average discount because, absent a sale, some of the trusts holding shares cannot terminate in less than 20 years.  In addition, because gain from the investment relies more heavily on long-term appreciation, that would also extend the necessary holding period to realize the investor's goals in such an investment.  CCC has no redemption policy, although the board indicated that it would consider redeeming an individual shareholder's shares.  Accordingly, it is uncertain whether redemption will occur, and the existence of such uncertainty warrants a somewhat higher than average discount.  There is no reason to consider "the costs of going public" in the circumstances of this case.

Accordingly, the factors outlined in Mandelbaum v. Commissioner, supra, overall, favor a lower-than-average discount for lack of marketability.  We hold that 15 percent is an appropriate discount for lack of marketability.  This discount, coupled with the 10-percent discount for lack of control produces a 23.5-percent discount $(1-(1-.10)(1-.15))$.[16]  Accordingly, we

---

[16] As already noted, the discounts reflected for the funds Mr. Frazier found to be comparable in his closed-end fund study may have reflected more than a lack of control discount.

hold that the 3,000 shares of CCC had a discounted value of $8,254,696[17] on March 4, 1999, the date of decedent's death.

To reflect the foregoing,

An appropriate order will be issued, and decision will be entered under Rule 155.

---

[17] Fair market value of CCC of $167,553,607, times 6.44-percent interest equals $10,790,452, less 23.5 percent ($2,535,756) equals $8,254,696.