T.C. Memo. 2006-152


UNITED STATES TAX COURT


HERBERT V. KOHLER, JR., ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 4621-03, 4622-03,      Filed July 25, 2006.
        4646-03, 4649-03.


<u>Phillip H. Martin</u>, <u>Peter S. Hendrixson</u>, <u>Mary J. Streitz</u>,
<u>Nathan E. Honson</u>, <u>Peter W. Carter</u>, and <u>John Rock</u>, for
petitioners.


<u>J. Anthony Hoefer</u> and <u>George Bezold</u>, for respondent.

---

    [1]This case is consolidated for briefing, trial, and opinion
with that of Ruth DeYoung Kohler, docket No. 4622-03, Estate of
Frederic C. Kohler, Deceased, Natalie A. Black, Personal
Representative, docket No. 4646-03, and Natalie A. Black, docket
No. 4649-03.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, Judge:  Respondent determined deficiencies in petitioners' Federal estate and gift taxes for 1998 and accuracy-related penalties under section 6662(a)[2] in the following amounts:

| Petitioner | Deficiency | Sec. 6662(a) Accuracy-Related Penalty |
|---|---|---|
| Herbert V. Kohler, Jr. | $416,550.23 | $83,310.05 |
| Ruth DeYoung Kohler | 393,367.41 | 78,673.48 |
| Estate of Frederic C. Kohler, Deceased, Natalie A. Black, Personal Representative | 53,650,374.00 | 10,723,941.40 |
| Natalie A. Black | 371,058.85 | 74,211.77 |

We are asked to decide the fair market value of stock of the Kohler Co. (Kohler or the company) owned by the estate of Frederic C. Kohler (the estate) on the alternate valuation date. The parties stipulated that the value of the Kohler stock at issue in the related gift tax cases shall be calculated by reference to the value of the Kohler stock we determine in the estate tax case.  The parties have also agreed that the per share value for the different classes of Kohler stock in each case

---

[2]All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

shall be determined by reference to an agreed formula that takes into account the value of the Kohler stock we determine.

We are also asked to decide whether each petitioner is liable for the accuracy-related penalty. The parties have resolved all other issues.

The estate reported on the estate tax return that the Kohler stock it owned was worth $47,009,625 on the alternate valuation date. Respondent determined that the Kohler stock the estate owned was worth $144.5 million on the alternate valuation date. We hold that the fair market value of the stock the estate owned is $47,009,625, as reported on the estate's tax return.[3] Because we have sustained the estate's valuation of its Kohler stock, we accordingly also find that the estate is not liable for the accuracy-related penalty. We also find that the petitioners in the gift tax cases are not liable for the accuracy-related penalty.

                    FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference. Herbert V. Kohler, Jr., Ruth

---

[3]The estate reported that its Kohler stock was worth $47,009,625 on the alternate valuation date and attached an appraisal to its return indicating the stock was worth $47,010,000. The parties stipulated that the appraisal report determined the stock was worth $47,009,625. The parties do not explain this $375 discrepancy.

DeYoung Kohler, and Natalie A. Black resided in Kohler, Wisconsin, at the time they filed their petitions. Frederic was domiciled in Wisconsin when he died, and his estate was probated in Wisconsin Circuit Court, Sheboygan County, Wisconsin.

The Kohler Company and the Kohler Family

Kohler is a well-known international manufacturer of plumbing products, cabinetry, tile, home furnishings, generators, engines, transfer switches, and switchgear, and also owns and operates hospitality and real estate businesses. Kohler has been a private company, predominantly owned by the Kohler family, since its founding in 1887. Many Kohler family members are Kohler employees.

Petitioners Herbert V. Kohler, Jr. (Herbert) and Ruth DeYoung Kohler (Ruth), as well as the late Frederic C. Kohler (Frederic), are the children of Herbert V. Kohler, Sr. and the grandchildren of the founder of Kohler, John Michael Kohler. Herbert has worked at Kohler almost all of his life, beginning by rotating through the manufacturing divisions during the summers when he was in his late teens and early twenties. Herbert has been the chairman and chief executive of Kohler since 1972 and president since 1974. Ruth, who is Herbert and Frederic's sister, was never an employee, director, or officer of Kohler and was not involved in company management at any time.

Frederic, who is Herbert and Ruth's brother, suffered from schizophrenia and was adjudged incompetent when he was 21 years old. He never married, had no children, and was under a guardianship throughout his adult life. Herbert served as guardian of his person, and a trust company was Frederic's guardian ad litem. Frederic did not work at Kohler other than for a brief period as an inspector in the enamel shop in his early twenties. Frederic was not involved in management and was never a director or officer of Kohler.

Frederic was diagnosed in 1997 with carcinoma and was seriously ill during the months before he died. He died unexpectedly of a heart attack on March 4, 1998, at age 54, only weeks before the cancer would have become extremely painful for him. When he died, Frederic owned 975 shares of Kohler common stock, which was approximately 12.85 percent of all outstanding capital stock of the company. After his death, Herbert's wife, Natalie Black (Natalie), who was close to Frederic personally, was appointed personal representative of the estate.

Natalie is the General Counsel of Kohler. Before joining Kohler in 1981, she worked at Quarles & Brady, a Wisconsin law firm.

Kohler's Business

Kohler operates its business through four separate divisions. The Kitchen and Bath division is the largest of the

four divisions and generated 70 to 75 percent of the company's revenues and profits annually in the years leading up to and including 1998. Kitchen and Bath is a full line plumbing products business that manufactures sinks, lavatories, toilets, bathtubs, faucets, cabinetry, tile and other products. The second largest division is Power Systems, which generated 15 to 20 percent of Kohler's revenues and profits annually in the years leading up to and including 1998. Power Systems manufactures and sells small gas engines that power lawn, garden, and turf equipment, as well as small industrial equipment, generators, and automatic transfer switches and switchgear.

The Interiors division, the third largest, manufactures and sells home furnishings and was responsible for 6 percent of Kohler's revenues and profits annually in the years leading up to and including 1998. The smallest division is Hospitality, which owns and operates a resort, a spa, and several golf courses. The Hospitality division generated about 4 percent of Kohler's revenues and profits annually in the years leading up to and including 1998.

All four divisions focus on maintaining the standard of quality and remaining on the leading edge of processing and product design. Kohler's stated mission is to improve the level of gracious living and to develop products and services that fit

this mission. Kohler's diverse product mix is unique. No other company sells all of the same types of products.

Privately Held Company

Kohler has always been a privately held family business. The Kohler family intends to continue their business as a private company. Management did not view dealing with stock analysts, outside probing, and pressure to produce earnings and raise the stock price on a regular basis to be in the best interests of the company. Herbert realized that public companies were much more beholden to stock analysts than private companies. Herbert was convinced that this type of dependence on outside forces could lead to unfavorable results for the company. For example, Kohler had a long history of faith in its investments and did not seek to unload them at the first sign of unprofitability. A public company might have less flexibility because a poorly performing investment might decrease earnings and depress the stock price. Kohler management was happy to avoid these types of concerns.

Kohler had a unique perspective on its role as a company. Rather than seeking to maximize its earnings at every opportunity, several members of Kohler management, including Herbert and Natalie, viewed themselves as stewards, responsible for the various constituencies the company touched, including associates, customers, suppliers, and employees. This view was another advantage of being a privately owned company that

benefited the community at large, and likely would have been more difficult to implement and maintain if Kohler were public.

Accordingly, Kohler has never registered its stock with the Securities and Exchange Commission and has never publicly sold its stock. Kohler stock has never traded on any organized securities exchange. Small lots, usually just one or two shares, were sold periodically in private transactions. Bid and ask prices for shares of Kohler stock were listed in the National Quotations Bureau's pink sheets. About 36 trades in Kohler stock were listed in the pink sheets from December 1993 through March 31, 1998.

Kohler has paid dividends to its shareholders at least annually since about 1900. Kohler's stated policy was to reinvest at least 90 percent of its earnings in its business each year, with 7 to 10 percent of earnings paid to shareholders as dividends. In recessionary times, Kohler's policy was to continue paying dividends even if it meant not reinvesting the 90 percent. Kohler management knew that the shareholders often depended on their dividends for their well-being. Receiving dividends was the primary way a Kohler shareholder could receive a return on his or her investment because the company was private. The shareholder could not simply sell the shares whenever he or she wished and could not count on appreciation in

market price to provide a return. Dividends were therefore important to shareholders, and Kohler recognized that.

## The Plans

Kohler generally used two types of projections to plan for its business. These projections were called the management plan and the operations plan, and each had different uses. The management plan was a set of achievable targets and reflected the realities of the business and management's best judgment of where the company would be. The management plan was given to outsiders intending to transact with Kohler, such as insurance companies and banks. Kohler also used the management plan internally for capital planning, acquisition planning, and tax planning. Management intended the management plan to be a good predictor of the company's performance and updated the management plan throughout the year to reflect Kohler's actual results.

Kohler also developed an operations plan, which was a projection of what could theoretically be achieved in a perfect environment. The operations plan was built on the assumptions that each business unit would maximize its results and no contingencies or unforeseen events would occur. The operations plan was not generally updated throughout the year to incorporate new information or unforeseen events.

The management plan projected earnings for 1999 to be below those for 1998 and 1997, reflecting the difficulties in the

international markets at the time and economists' predictions of either slow growth or a decline in the United States economy. Indeed, Herbert was aware of excesses creeping into the market and knew the company's international investments were not doing well.

The Reorganization

In early 1998, Kohler family members, various charities established by Kohler family members, and trusts for the benefit of Kohler family members held most of the shares of Kohler stock. Outside shareholders, however, held about 4 percent of the Kohler stock in March 1998. The Kohler family and management wanted to keep the company as privately owned as possible and remove the outside shareholders. The family and management also wanted to facilitate estate planning for Kohler family members and allow later generations a vote on company matters. In addition, the family and management wanted to resolve control and ownership questions and ensure that Kohler was ready for future generations of the family to take control when the time came. The family and management considered various options and decided a reorganization would best meet the company's needs.

Kohler initially retained the Dorsey and Whitney law firm to assist in the reorganization in early 1996. The reorganization was finally completed and became effective on May 11, 1998. The reorganization replaced the old shares of Kohler common stock

with new classes of shares that had various voting rights and dividend preferences.  For each old share, family shareholders had the right to receive either $52,700 in cash or one share of voting common stock (which had one vote per share), 244 shares of series A nonvoting common stock, and 5 shares of series B nonvoting common stock (which carried the right to an additional cumulative cash dividend[4] of $15 per share for each of 20 years following the reorganization).  Nonfamily shareholders could not elect to accept new shares.  Instead, they were required to either accept the $52,700 per old share cash out price or to exercise dissenter's rights.

All of the new shares of Kohler stock were subject to transfer restrictions and a purchase option to ensure that family shareholders would continue to own all of the shares of Kohler. The reorganization qualified as a tax-free reorganization under section 368(a).

Certain nonfamily shareholders exercised their dissenters' rights in the reorganization and litigated with Kohler to achieve a higher price for their shares.  Some of these shareholders also claimed that Kohler management breached their fiduciary duties. Kohler ultimately settled with these shareholders for varying

---

[4]An additional cumulative cash dividend is a dividend paid in addition to the dividends periodically declared and paid to all shareholders.  If the additional dividend is not declared and paid when due, the arrears accumulate.

prices, up to $135,000 per share in some cases. A portion of the settlement price was attributable to settling the dissenters' claims for breach of fiduciary duty.

The estate, which owned 12.85 percent of the voting stock before the reorganization, could not have blocked or approved the reorganization on its own. The estate opted to receive new Kohler shares in the reorganization rather than accept cash. After the reorganization, the estate owned 14.45 percent of the outstanding shares of Kohler stock. The estate owned a greater percentage of Kohler after the reorganization than before because the nonfamily shareholders had been cashed out. The block of stock the estate owned was not sufficient by itself to vest the estate with the power to change management, change the board of directors, or amend the articles of incorporation.

Valuation of Kohler Stock on the Estate Tax Return

The estate consisted of primarily cash, some securities and personal effects, and the Kohler stock. Natalie, as personal representative of the estate, retained Willamette Management Associates (WMA) to value the Kohler stock the estate owned. Natalie selected WMA for several reasons. WMA had periodically appraised the company for various purposes in the past and knew the company and its business already. Natalie was also impressed by WMA's national reputation and WMA's connection to Shannon Pratt, who wrote a well-known book on appraisals entitled

"Valuing a Business."  Robert Schweihs (Mr. Schweihs) was the WMA appraiser who handled the valuation of the estate's stock, and Natalie knew he was well recognized in the field and was co-author of "Valuing a Business."  Natalie gave Mr. Schweihs all the information he requested in connection with his appraisal.

WMA's appraisal report determined that the fair market value of the Kohler stock held by the estate as of September 4, 1998, was $47.010 million.[5]  WMA also determined that the value of the Kohler stock held by the estate on the date Frederic died was $50.115 million.  Natalie attached the appraisal reports to the estate tax return the estate filed.  Natalie elected to value all of the property in Frederic's gross estate as of the alternate valuation date of September 4, 1998, and reported the value of the Kohler stock on that date, $47,009,625, on the estate tax return.

During examination of the estate's return, respondent requested numerous documents, many of which the estate produced.  Respondent issued a summons to the estate to obtain certain documents dealing with post-valuation date events and documents containing sensitive Kohler business information.  The estate filed a motion to quash the summons.  Natalie, as personal representative of the estate, was concerned about the relevancy

---

[5]See supra note 3 for a discussion of a minor inconsistency between the estate tax return, the parties' stipulations, and the WMA appraisal.

of the information respondent requested and sought to protect the private company information. See Estate of Kohler v. United States, 89 AFTR 2d 1279, 2002-1 USTC par. 60,435 (E.D. Wis. 2002). The court denied the motion to quash and the estate then produced the requested documents.

Deficiency Notices

Respondent issued a deficiency notice to the estate that determined the fair market value of the Kohler stock the estate held on the alternate valuation date was $144.5 million. This valuation was based on an appraisal report prepared by Richard May of Valumetrics Advisors, Inc. The estate timely filed a petition. Respondent also determined deficiencies in gift taxes for Herbert, Natalie, and Ruth, and each also filed a timely petition.

OPINION

We are asked to determine the fair market value of the Kohler stock the estate held and whether any of the petitioners are liable for the accuracy-related penalty. The estate argues that the aggregate fair market value of the Kohler stock it held on the alternate valuation date was $47,009,625. Respondent argues that the fair market value of the stock on the alternate valuation date was $144.5 million, a difference of approximately $100 million from the value the estate reported. We shall begin by considering the burden of proof.

I.  Burden of Proof

In general, the Commissioner's determinations in the deficiency notice are presumed correct, and the taxpayer has the burden of proving that the Commissioner's determinations are in error.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The burden of proof may shift to the Commissioner with respect to a factual issue relevant to a taxpayer's liability for tax under certain circumstances, however, if the taxpayer introduces credible evidence and establishes that he or she substantiated items, maintained required records, and fully cooperated with the Commissioner's reasonable requests.  Sec. 7491(a)(2)(A) and (B).[6]

At trial, we granted the estate's motion to shift the burden of proof to respondent, because we found that the estate introduced credible evidence including the testimony of several factual witnesses, substantiated items, maintained records, and cooperated with respondent's reasonable requests.

A. The Estate's Cooperation With Respondent

Respondent urges us to revisit the question of the burden of proof now, arguing that the estate did not cooperate with respondent's reasonable requests because the estate filed a

_____

[6]Sec. 7491 is effective with respect to court proceedings arising in connection with examinations by the Commissioner commencing after July 22, 1998, the date of enactment of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(a), 112 Stat. 726.

motion to quash a summons that respondent had issued to obtain certain documents from the estate.

We disagree. Based on our review of the record and petitioners' arguments, we find that the estate had a good faith belief that some of the documents respondent sought were irrelevant, sealed, or contained sensitive Kohler business information and filed a motion to quash the summons to protect its rights. Once the court denied the estate's motion to quash the summons, the estate provided the documents respondent requested. Respondent has not argued that respondent's investigation was impaired by any lack of documentation. Moreover, the voluminous exhibits that are part of the record belie this argument.

Respondent cites several cases where we did not shift the burden of proof to the Commissioner where the Commissioner was forced to issue a summons to force compliance with an information request. AMC Trust v. Commissioner, T.C. Memo. 2005-180; Rinn v. Commissioner, T.C. Memo. 2004-246; Burnett v. Commissioner, T.C. Memo. 2002-181, affd. 67 Fed. Appx. 248 (5th Cir. 2003); Pham v. Commissioner, T.C. Memo. 2002-101. No case that respondent cites involves a taxpayer's legitimate attempt to protect confidential or proprietary business information. In contrast, these cases involve sham trusts, taxpayers who failed to file returns, taxpayers who had unreported income, and taxpayers who asserted

typical tax-protester arguments. These cases can be characterized as involving taxpayers with a pattern of noncooperation with the Commissioner and failure to comply with tax obligations.

Unlike the cited cases, the estate had legitimate concerns about providing confidential and proprietary business information that was possibly irrelevant and sought to protect the company by not producing this information until a court required it. This is not a tax protester or sham trust case. In fact, the estate was cooperative throughout the audit and produced most of the documents respondent requested, including the documents subject to the summons once the estate lost its motion to quash the summons. See Estate of Kohler v. United States, supra. Simply because the estate filed a motion to quash a summons due to legitimate concerns about the relevancy of the information sought does not require a finding that the estate failed to cooperate with respondent.

B. The Estate's Introduction of Credible Evidence

Respondent also argues that the estate has not produced credible evidence in support of its position. See sec. 7491(a)(1). Respondent points out that we have previously held that opinion testimony is not credible evidence to support shifting the burden of proof. See Estate of Jelke v. Commissioner, T.C. Memo. 2005-131. Estate of Jelke involved a

disagreement regarding a finite legal conclusion, whether a corporation's value should be reduced to reflect a built-in capital gain liability. Id. We held there that the burden of proof issue was irrelevant when essentially no facts are in dispute, and we declined to determine which party had the burden of proof. Id.

We agree that, where the underlying facts are not in dispute, it is irrelevant who has the burden to prove these facts. See id.; Estate of Deputy v. Commissioner, T.C. Memo. 2003-176. Here, however, the parties dispute several important underlying facts.

We are asked to determine the fair market value of a portion of a privately held company operating in numerous market segments and geographical regions, which is a question of fact. See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Natl. Grocery Co., 304 U.S. 282, 294 (1938). The parties devote numerous pages in their briefs to objecting to the other side's proposed findings of fact. Cf. Estate of Deputy v. Commissioner, supra. For example, the parties dispute the predictive value of the operating plan versus the management plan and the impact of various economic indicators on the fortunes of the Kitchen and Bath business segment.

Moreover, the estate introduced the testimony of several fact witnesses, in addition to the estate's two experts, to

support its position.  These witnesses included Herbert, Natalie, and Jeffrey Cheney, who is the chief financial officer and vice president of Kohler.  The parties also provided the Court with a stipulation of facts containing nearly 200 exhibits, which they used on brief to support their respective positions and to object to each other's proposed findings and positions.

There are enough facts at issue to make the burden of proof a meaningful issue, rather than simply an academic one.  Cf. Estate of Jelke v. Commissioner, supra; Estate of Deputy v. Commissioner, supra.  On this record, which includes such voluminous evidence, we find that the estate introduced credible, factual evidence supporting its position.

Accordingly, we find that the estate has satisfied the requirements of section 7491(a), and we stand by our ruling at trial that respondent has the burden of proof.

## II.  Choice of Valuation Date and Stock To Be Valued

We now consider the appropriate valuation date and the characteristics of the stock to be valued.

### A.  Choice of Valuation Date

Before trial, petitioners and respondent each filed motions for partial summary judgment regarding whether the post-reorganization Kohler stock or the pre-reorganization Kohler stock should be considered in the valuation.  The Court denied both motions then because the issue was premature.

Respondent then sought to amend respondent's answer after the deadline for motions with respect to the pleadings to assert that the proper valuation date was the date of Frederic's death, rather than the alternate valuation date. We denied respondent's motion to amend his answer due to the substantial disadvantage and prejudice to petitioners if respondent amended his answer at such a late date. We accordingly shall not consider respondent's renewed arguments that the stock should be valued on the date of Frederic's death, rather than the alternate valuation date.

B.   Stock To Be Valued

Respondent renews two arguments he made in his motion for partial summary judgment regarding the stock to be valued. He argues that we should value the pre-reorganization stock on the alternate valuation date, or, alternatively, that we should ignore the transfer restrictions and the purchase option in valuing the post-reorganization stock. Although these issues are now ripe for decision, we reject both respondent's arguments.

1.   General Rules on Valuation Date

Section 2032 allows the executor of an estate to choose to value the estate's property at a time after the date of death. Sec. 2032(a). If an executor chooses this option, property "distributed, sold, exchanged, or otherwise disposed of" within 6 months after the decedent's death is valued as of the date of the distribution, sale, exchange, or other disposition. Sec.

2032(a)(1).  Property that has not been distributed, sold, exchanged, or otherwise disposed of within 6 months after the decedent's death is valued as of the date 6 months after the decedent's death.  Sec. 2032(a)(2).  The election to use the alternate valuation date may only be made if it has the effect of decreasing the value of the gross estate and the sum of the estate tax and the generation-skipping transfer tax imposed with respect to decedent's property.  Sec. 2032(c).

There is an exception for tax-free reorganizations under section 368(a).  Stock exchanged for stock of the same corporation in a tax-free reorganization is not treated as distributed, exchanged, sold, or otherwise disposed of under section 2032(a).  Sec. 20.2032-1(c)(1), Estate Tax Regs.  Accordingly, the Kohler stock is not treated as disposed of on the date of the reorganization and is not valued as of May 11, 1998, the date of the reorganization, but on the alternate valuation date instead.  See sec. 2032(a)(2); sec. 20.2032-1(c)(1), Estate Tax Regs.

2.    Respondent's Argument That We Should Value Pre-Reorganization Stock

Respondent also argues that we should value the pre-reorganization stock, rather than the post-reorganization stock, as of the alternate valuation date.  We disagree.  Respondent's argument relies on section 20.2032-1(d), Estate Tax Regs.  This regulation addresses the rules for certain types of property

interests, such as dividends and leased property, which may undergo changes in form as dividends are declared and paid or rent accrues and is paid. It is those property interests that exist as of the date of death that are valued if the executor elects the alternate valuation date. Sec. 20.2032-1(d), Estate Tax Regs. These date of death property interests remain included in the estate even if they change in form (such as in a disposition) between the date of decedent's death and the alternate valuation date. Id.

This provision does not support respondent's argument that stock received in a tax-free reorganization should be disregarded and that the pre-reorganization stock should be valued instead. In fact, the regulation does not discuss tax-free reorganizations. Nothing in this regulation requires us to disregard the tax-free reorganization when valuing the property. We therefore find no authority to treat such an exchange as a change in form or to disregard the exchange.[7]

_____

[7]We note that the fair market value of the post-reorganization stock must generally equal the fair market value of the pre-reorganization stock for the reorganization to be tax free. See Rev. Rul. 74-269, 1974-1 C.B. 87; Rev. Proc. 86-42, sec. 7.01(1), 1986-2 C.B. 722 (prerequisite to advance ruling that a type A merger will be tax free is a representation that the fair market value of the acquirer stock and other consideration received will be approximately equal to the fair market value of the target stock surrendered in the exchange); Rev. Proc. 81-60, sec. 4.03(2)(d), 1981-2 C.B. 680, 682 (prerequisite to advance ruling that a type E recapitalization will be tax free is a representation that the fair market value
(continued...)

### 3. Respondent's Argument To Disregard Transfer Restrictions and Purchase Option

Respondent argues alternatively that the post-reorganization Kohler stock the estate held on the alternate valuation date should be valued without regard to the transfer restrictions and purchase option. See Flanders v. United States, 347 F. Supp. 95 (N.D. Cal. 1972). We disagree.

Flanders involved restrictions implemented between the date of death and the alternate valuation date that reduced the value of land by 88 percent. The District Court held that these restrictions should not be considered in valuing the land, relying on statements by a congressman on the floor of Congress before the enactment of section 2032 that the section is intended to address changes in value caused by market forces. Respondent argues that we should reach a similar result here.

We look to legislative history when statutory language is ambiguous. Blum v. Stenson, 465 U.S. 886, 896 (1984). There is no ambiguity here and thus no need to consider legislative history. The terms "distributed, sold, exchanged, or otherwise disposed of" in section 2032 are explained in the regulations. The regulations specify that "otherwise disposed of" does not

---

[7](...continued)
of the shares to be surrendered will equal the shares to be received in exchange). As the parties stipulated that the reorganization was tax free, we question why respondent continues to make this argument.

include transactions under section 368(a) where no gain or loss is recognizable. Sec. 20.2032-1(c)(1), Estate Tax Regs. Moreover, we find the regulation consistent with the legislative history relied on by the District Court in Flanders because the legislative history describes the general purpose of the statute, not the specific meaning of "otherwise disposed of" in the context of tax-free reorganizations. The meaning adopted in section 20.2032-1(c)(1), Estate Tax Regs., is consistent with this general purpose, reflecting the Secretary's determination that tax-free reorganizations do not constitute dispositions because of the strict requirements in the corporate reorganization provisions.

Accordingly, we shall value the post-reorganization stock on the alternate valuation date, including the transfer restrictions and the purchase option. See sec. 2032(a); sec. 20.2032-1(c)(1), Estate Tax Regs.

III. Valuation of Kohler Stock the Estate Owned

The parties have narrowed the valuation questions in this case to the value of Kohler stock the estate owned. The value of property is a quintessential question of fact. The parties advocate values on the alternate valuation date that are approximately $100 million apart. We begin our analysis of the experts' reports after first discussing the law on valuing property.

A. Fair Market Value

The transfer of the taxable estate on the decedent's death is subject to estate taxes. Sec. 2001; Estate of Deputy v. Commissioner, T.C. Memo. 2003-176. The taxable estate is the gross estate less allowable deductions. Sec. 2051. The gross estate includes the value of all property owned by a decedent at the time of death. Sec. 2031. In most instances, the value of the gross estate is the fair market value of the included property as of either the date of death, or the alternate valuation date under section 2032 if the personal representative elects, as Natalie did here. Sec. 20.2031-1(b), Estate Tax Regs.

Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither under any compulsion to buy or sell and both having knowledge of relevant facts. Sec. 20.2031-1(b), Estate Tax Regs. The determination of fair market value is a question of fact, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119 (1944); Helvering v. Natl. Grocery Co., 304 U.S. 282 (1938).

While listed prices normally establish fair market value of publicly traded stock, the value of unlisted stock is best determined by considering actual sales at arm's length in the normal course of business within a reasonable time before or

after the valuation date.  Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Estate of Noble v. Commissioner, T.C. Memo. 2005-2.  When arm's-length sales of unlisted stock are unavailable or inconclusive, the value of closely held stock shall be determined by considering all other available financial data and all relevant factors that would affect fair market value.  Rev. Rul. 59-60, 1959-1 C.B. 237.  These factors include the corporation's net worth, prospective earning power, dividend-paying capacity, and other factors.  Estate of Andrews v. Commissioner, supra at 940; sec. 20.2031-2(f), Estate Tax Regs.; Rev. Rul. 59-60, sec. 4.01, 1959-1 C.B. at 238.  These factors cannot be applied with mathematical precision, and the weight given to each factor must be considered in light of the particular facts of each case.  Estate of Andrews v. Commissioner, supra at 940-941.

B.    Expert Opinions

Both parties submitted expert reports providing valuations of the estate's Kohler stock as of the alternate valuation date, which considered many different factors and ascribed different weights for each, resulting in a wide range of proposed valuations.[8]  See Estate of Deputy v. Commissioner, supra.  The

---

[8]Both parties also submitted expert reports providing valuations of the stock as of Frederic's date of death.  The expert report the estate submitted as of Frederic's date of death concluded that the value of the stock was higher on the date of

(continued...)

experts' value conclusions with respect to the estate's stock on the alternate valuation date differed by more than $100 million, no nominal amount.

When considering expert testimony, a court is not required to follow the opinion of any expert if it is contrary to the court's judgment.  Id. (citing Helvering v. Natl. Grocery Co., 304 U.S. at 295 and Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285).  A court may adopt or reject expert testimony and will reject expert testimony where the witness' opinion of value is so exaggerated that the testimony is incredible.  Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); Chiu v. Commissioner, 84 T.C. 722, 734-735 (1985); Estate of Deputy v. Commissioner, supra.

We are not obligated to pay any regard to an expert opinion that lacks credibility.  Estate of Hall v. Commissioner, supra; Chiu v. Commissioner, supra; Estate of Deputy v. Commissioner, supra.  We may find evidence of valuation provided by one of the parties to be much more credible than that of the other party, so that our findings result in a significant victory for one side, rather than a compromise between the two.  See Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980).

---

[8](...continued)
death than on the alternate valuation date.  See sec. 2032(c).

We shall now examine the experts' opinions and methodologies, keeping in mind that respondent has the burden of proof to show that the value the estate reported on its return is incorrect.

C.    Respondent's Expert Witness:  Dr. Scott Hakala of CBIZ

Because respondent has the burden of proof, we shall first consider the conclusions of respondent's expert witness, Dr. Scott Hakala.  Dr. Hakala concluded that the fair market value of the estate's stock on the alternate valuation date was $156 million.  We explained to the parties after respondent rested his case that we had grave concerns about Dr. Hakala's valuation methods and conclusions.  We continue to have these concerns.

1.    Dr. Hakala's Background and Certifications

Although Dr. Hakala has a doctorate from the University of Minnesota and is a chartered financial analyst, he is not a member of the American Society of Appraisers (ASA) nor the Appraisal Foundation.  Dr. Hakala's report also was not submitted in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP).  Dr. Hakala did not provide the customary USPAP certification, which assures readers that the appraiser has no bias regarding the parties, no other persons besides those listed provided professional assistance, and that the conclusions in the report were developed in conformity with USPAP.

### 2. Dr. Hakala's Valuation Processes and Methodologies

Dr. Hakala's background research on Kohler was limited. He met with Kohler management just once, for about 2-1/2 hours. He did obtain financial information from the company including both the operations plan and management plan, however, and also considered industry information.

Dr. Hakala used two of the three traditional approaches to business valuation, the income approach and the market approach. We agree with his decision not to use the third approach, the cost approach, which is best suited for asset-intensive businesses rather than going concerns. Like petitioners' experts, he also did not consider any actual sales of Kohler stock in his analysis. We shall briefly describe Dr. Hakala's use of the income approach and the market approach.

Dr. Hakala used only one method under the income approach, and it was not a dividend-based method. He used only a discounted cash flow (DCF) method.[9] Dr. Hakala stated that the DCF method was the most accurate method and was convinced of the redundancy or unreliability of dividend-based methods.[10]

---

[9]The DCF method discounts to present value the expected future income of the corporation to generate a value for the business and the stock.

[10]Dividend-based methods, in contrast to the DCF method, generally value the stock based on the expected future dividends to be received on the stock. Some dividend-based methods also take into account the probability of possible liquidity events

(continued...)

In forecasting the cash flow for the DCF method, Dr. Hakala did not use the expenses in the projections Kohler provided him. He decided to make his own assumptions about expenses. Dr. Hakala applied these assumptions without first discussing them with anyone at Kohler.

Dr. Hakala created two DCF models, one using revenues from the operations plan and one using revenues from the management plan. He weighted the results he derived from these two DCF models in a manner inconsistent with the reality of the business. He weighted the realistic management plan based model 20 percent and the more aspirational operations plan based model 80 percent because he thought the aspirational operations plan was a more likely scenario.

Dr. Hakala made a last minute correction to the value he determined under the income approach at trial. His error resulted in an $11 million overvaluation of the Kohler stock in his report.

Under the market approach, Dr. Hakala used two methods. Like the estate's experts, he used the guideline company method, but was the only one of the three experts who used the transaction method.[11] While the estate's experts did not find

---

[10](...continued)
such as initial public offerings.

[11]The guideline company method examines certain financial
(continued...)

transactions in companies that had sufficient similarity to Kohler, Dr. Hakala found transactions he thought were comparable and then applied the ratios he found in those transactions to value the Kohler stock.

Once Dr. Hakala determined the values under the transaction method and the guideline company method, Dr. Hakala decided to weight the guideline company approach 80 percent and the transaction method 20 percent. Dr. Hakala thought the guideline company method was more reliable, and there were not very many comparable transactions that could be used in the transaction method.

After Dr. Hakala had weighted the values he found under each approach, he averaged the approaches and considered whether a discount for lack of marketability should be applied. He concluded a 25-percent discount was appropriate.

Including his adjustment for his $11 million error, Dr. Hakala determined that the Kohler stock held by the estate was worth $156 million on the alternate valuation date.

---

[11](...continued)
information and market prices of publicly traded comparable companies and compares that financial information with financial information of the corporation to be valued to project the price that shares of the corporation to be valued would sell for if the corporation to be valued were publicly traded. The transaction method is similar to the guideline company method except that comparable companies that have recently been acquired are selected and the financial information is compared to the price obtained in the transaction, rather than the market price.

### 3. Analysis

We have several significant concerns about the reliability of Dr. Hakala's report. These concerns lead us to place no weight on Dr. Hakala's report as evidence of the value of the Kohler stock the estate held. We have previously discussed the lack of customary certification of Dr. Hakala's report and that his report was not prepared in accordance with all USPAP standards. We also have already noted that Dr. Hakala admitted that his original report submitted to the Court before trial overvalued the estate's Kohler stock by $11 million, or more than 7 percent of the value he finally decided was correct. This is not a minor mistake. When we doubt the judgment of an expert witness on one point, we become reluctant to accept the expert's conclusions on other points. Brewer Quality Homes, Inc. v. Commissioner, T.C. Memo. 2003-200, affd. 122 Fed. Appx. 88 (5th Cir. 2004).

Moreover, we are convinced from his report and trial testimony that Dr. Hakala did not understand Kohler's business. He spent only 2-1/2 hours meeting with management. He decided the expense structure in the company's projections was wrong and decided to invent his own for his income approach analysis. He did not discuss his fabricated expense structure with management to test whether it was realistic. Dr. Hakala also decided to weight the operations plan model 80 percent and the management

plan model only 20 percent under the income approach, despite the admonitions of management that the operations plan projections were only what could be created in a perfect environment while the management plan forecasted realistic, achievable targets.

In addition, Dr. Hakala did not use a dividend-based method under the income approach, although the record reflects that periodic dividends were the primary means of obtaining a return on Kohler stock due to the privately held nature of the company. When asked why he did not use the dividend method at trial, Dr. Hakala argued first that the DCF analysis made other income approaches redundant and then stated that dividend-based methods were unreliable. We are concerned by Dr. Hakala's choice to ignore any dividend-based method for Kohler, a privately owned company that periodically and historically has paid large dividends as a return to its shareholders, recognizing that no ready market exists for a shareholder wishing to sell.

We found after the estate's case in chief that respondent has the burden to prove that the value of the Kohler stock on the estate's return was incorrect. After carefully reviewing and considering all of the evidence, we continue to find Dr. Hakala's conclusions to be incredible. We therefore give no weight to respondent's expert's conclusions. Respondent has therefore not met his burden of proof. Accordingly, we find the value of the

estate's stock to be the amount the estate reported on its return, $47,009,625.

D.   Petitioners' Expert Witnesses

We now briefly describe the reports and valuation conclusions of petitioners' experts, Mr. Schweihs and Mr. Grabowski, each of whom we find thoughtful and credible.  We give significant weight to their reports, which lend further support to our conclusions.

1.   Mr. Schweihs' Valuation

Mr. Schweihs is a managing director of WMA, has been accredited as a senior appraiser in business valuation by the ASA, and is a Certified Business Appraiser of the Institute of Business Appraisers.  He has authored several books, including co-authoring "Valuing a Business" with Shannon Pratt and Robert Reilly,[12] and has written between 50 and 100 articles on valuing businesses.  Mr. Schweihs also gives two to four lectures a year on the topic.  He has appraised businesses since the early 1980s, and his core work is valuing businesses and business interests, including advising acquirers and sellers, taxation matters, and dispute resolution.  Mr. Schweihs had periodically performed valuations of Kohler stock in the several years before the valuation date and is very familiar with the company.  For this

---

[12]Shannon P. Pratt, Robert F. Reilly & Robert P. Schweihs, Valuing a Business (4th ed. 2001).

assignment in particular, he was required to review significant information regarding the company and interview Kohler management.

Mr. Schweihs used the income approach and the market approach to value the estate's Kohler stock. Under the income approach, Mr. Schweihs used not only the DCF method, but also the discounted dividend method and the dividend capitalization method. He recognized that the dividend methods were important indicators of value where dividends represent the best, if not the only, opportunity for a minority shareholder to receive a cash return on his or her investment. Under the market approach, Mr. Schweihs used the capital market method, also known as the guideline company method. Mr. Schweihs did not use the transaction method, unlike Dr. Hakala, because he was unable to find transactions in companies sufficiently similar to Kohler where there was adequate information available.

Mr. Schweihs also did not account for prior sale transactions of Kohler stock in determining the value. He determined that the transactions included a premium for being able to be a shareholder in a prominent, privately held company like Kohler, and that this premium could not be quantified.[13]

---

[13]We also note that the evidence of the pre-reorganization transactions (including the $135,000 price received by the dissenting shareholders in the litigation) is not helpful because these transactions involve pre-reorganization stock, which is not

(continued...)

Mr. Schweihs also determined that the prices paid in the transactions were not justified by analyzing the company's historical and expected future performance.

Mr. Schweihs also did not rely on the asset-based approach because Kohler is a going concern operating company. An asset-based approach, in his view, generally is not a reliable indicator of value for going concern companies.

Mr. Schweihs applied a 45-percent lack of marketability discount to the values he determined under the DCF method and the capital market method, and a 10-percent lack of marketability discount to the values he determined under the discounted dividend method and the capitalization of dividends method. He used a lower discount for lack of marketability under the dividend methods because, in his view, the dividend method more directly reflected the value of the shares. Mr. Schweihs also determined that a 26-percent discount for lack of control applied to the value he determined under the DCF method.

Mr. Schweihs weighted the DCF method and the capital market method each 20 percent in his final analysis, and gave 30 percent weights to each of the dividend methods. He concluded that the fair market value of the Kohler stock the estate owned on the

---

[13](...continued)
the stock we value in this case. For example, the pre-reorganization stock did not have the same transfer restrictions and purchase option (thus affording purchasers more liquidity), and the capital structure was different.

alternate valuation date was $47.010 million. Mr. Schweihs used a similar analysis to value the pre-reorganization shares on the date of Frederic's death, 6 months earlier, and determined the fair market value of those shares on the date of Frederic's death was $50.115 million.

### 2. Mr. Grabowski's Valuation

Mr. Grabowski was another expert who prepared an appraisal report and testified for the estate. He has been valuing companies since 1974, first with S&P Corporate Value Consulting and since September 2005, as a managing director with Duff & Phelps. He is a member of the ASA and is an accredited senior appraiser with the ASA in business valuation. He has taught finance and valuation courses at Loyola University, taught classes for the ASA, and teaches a class on cost of capital. The majority of his work is valuation services in nonlitigation settings, and he has valued several businesses similar to Kohler, including plumbing fixture businesses and closely held companies.

Mr. Grabowski spent 3-1/2 days at the company and interviewed 12 employees, spending considerable time with 6 of them, including Herbert (the President and Chairman of the Board) and Natalie (the General Counsel). Mr. Grabowski also reviewed numerous documents and considered general economic conditions and the industries in which Kohler operates.

Mr. Grabowski used the income approach and the market approach to value the Kohler stock. Under the income approach, Mr. Grabowski used the DCF method, the discounted dividend method, and the adjusted discounted dividend method. Mr. Grabowski used the management plan to perform these analyses because he considered it the most accurate estimate of the future performance of the company.

Under the market approach, Mr. Grabowski used the guideline publicly traded company method. He identified publicly traded companies in each market segment in which Kohler operated and applied valuation multiples to these entities to estimate the value of each Kohler market segment. He then weighted the valuation conclusion as to each segment of the business based on the relative portion of Kohler's business that the segment comprised. Mr. Grabowski did not use the cost approach because Kohler was a growing and profitable business that was likely worth more than the values of its assets.

Mr. Grabowski then considered each of the values he had determined and found that they all resulted in values fairly close to each other. He assessed the strengths and weaknesses of each method and ultimately decided that the adjusted discounted dividend method was the most appropriate method because it reflected the actual cash flows a shareholder could expect to receive. The adjusted discounted dividend method also reflected

the remote possibility that Kohler would be sold or undergo an initial public offering. The closeness of the values determined by the other methods acted as a check that this value was correct. He also reconciled his conclusion to prior sales of Kohler stock to confirm the reasonableness of the analysis.

Mr. Grabowski then made adjustments to the value determined under the adjusted discounted dividend method to reflect that Kohler was closely held and the number of shares of stock the estate owned. Mr. Grabowski settled on a 35-percent discount for lack of marketability. He determined this discount was correct by considering studies of restricted stock and the stock of other companies similar to Kohler. He found that the restricted stock studies did not give the full picture of the appropriate marketability discount because the studies involved only companies that eventually went public and therefore their shares eventually became marketable. Mr. Grabowski concluded an eventual public offering was not likely with Kohler and therefore determined that a slightly higher discount was appropriate.

Mr. Grabowski determined that a 25-percent adjustment for lack of control was warranted only in considering the value of the Hospitality group and in considering the price paid to dissenting shareholders in the reorganization. In making the 25-percent adjustment, he considered factors such as the Kohler family's stated intention to control the company long term,

certain sales of Kohler stock, transactions in the industry involving acquisitions of businesses with control premiums, and published benchmark data.

Mr. Grabowski then adjusted the value he determined for the adjusted discounted dividend method to reflect the discounts for lack of marketability and lack of control to determine that the fair market value of the estate's Kohler stock on the alternate valuation date was $63,385,000.

### 3. Analysis

We are impressed by the valuation methodologies and conclusions of Mr. Schweihs and Mr. Grabowski. Both are certified appraisers who spent sufficient time with the company and management to understand the Kohler business. They used the correct projection to value the business, the realistic and accurate management plan, as a result of their understanding of Kohler. They were also aware that the primary return a shareholder could expect from owning Kohler stock was from periodic dividends, and both made dividend methods an essential component of their analyses.

We find that the estate's experts have provided thoughtful, credible valuations strongly supporting the value the estate reported on its tax return. We also find that the estate's experts' appraisals are more thorough and consistent with traditional appraisal methodologies for closely held companies

like Kohler. We accordingly give significant weight to their valuations.

IV. Valuation of the Estate's Stock

As previously stated, we give no weight to respondent's expert's valuation of the estate's stock. Respondent failed to introduce any evidence or present any arguments to persuade us that the value reported on the estate's tax return was incorrect, and accordingly respondent has failed to meet his burden of proof. In contrast, both of the estate's experts provided thoughtful valuations reflecting the true nature of the Kohler business and used valuation methods considered reliable for privately held companies like Kohler. Each valuation provided persuasive support for the value the estate reported on its return. We ascribe great weight to both of these valuations and further find that the estate's experts' reports created a range significantly closer to the actual fair market value than respondent's expert found.

Accordingly, based on our review of all of the valuation evidence, giving due regard to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the fair market value of the Kohler stock owned by the estate on the alternate valuation date was $47,009,625.

## V.  Accuracy-Related Penalty

We have found the value of the stock held by the estate is the value the estate reported on its return.  We therefore need not address whether the estate is liable for the accuracy-related penalty.  Respondent also determined that the petitioners in the gift tax cases were liable for the accuracy-related penalty under section 6662(a).

There is generally a 20-percent penalty on any portion of an underpayment attributable to a substantial estate or gift tax valuation understatement.  Sec. 6662(a) and (b)(5).  There is a gift tax valuation understatement where property is reported on a gift tax return at a value 50 percent or less than the value eventually determined by the court.  Sec. 6662(g)(1).  Where property is reported at a value less than 25 percent of the value eventually determined by the court, the penalty imposed under section 6662 is increased from 20 percent to 40 percent.  Sec. 6662(h).  Respondent has the burden of production regarding penalties and must come forward with evidence that it is appropriate to impose the penalty.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

The parties have stipulated that the final value of the gifts will be governed by our ruling on the value of the estate's stock and have provided us with the formula they intend to use to calculate the valuation of each gift.  Based on our review of

this formula and the value we concluded in the estate tax case, we find that none of the petitioners in the gift tax cases has made a substantial gift tax valuation understatement.  See sec. 6662(g).

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered under Rule 155</u>.